## A. B. BAXTER *vs.* GEORGE E. DENEEN ET AL.

*Gaming Contract—Recovery of Money Deposited as Margin—Jurisdiction of Equity.*

A party to a gambling contract in shares of stock who has placed the sum wagered in the possession of the other party as margins is not entitled, upon repudiating the transaction, to the aid of a Court of equity to recover back the money so paid.

Defendant was the proprietor of a "bucket shop" where contracts for the purchase and sale of shares of stock were made with parties depositing money as margin, but with the common purpose of merely wagering on the future market price of the shares, the same not being actually delivered. Plaintiff was a customer of the defendant and requested the latter to keep a certain sum on deposit in a designated bank upon such terms that it could not be withdrawn at will but would remain as security for his contracts in said business. Defendant refused to do this but promised to keep sufficient amount in the bank to meet his liabilities, and did deposit there a large amount subject however to his own order. Plaintiff afterwards paid a sum of money to defendant as margins on certain stock gambling transactions and this sum was deposited in the

bank to the credit of defendant's personal account together with other money of the defendant. The bank was not a party to the dealings between plaintiff and defendant. Subsequently plaintiff filed the bill in this case declaring his purpose to rescind the gaming contract with the defendant and asked for an injunction to restrain the bank from paying to the defendant the money so deposited there and for a decree directing the return to the plaintiff of the sum paid by him as margin. *Held*, that since the wager between the parties was an illegal contract equity will not aid the plaintiff to recover back what he had paid thereunder, nor will the bank be compelled to pay to plaintiff the amount so given by him for margins, since the bank was not a stake holder, and that if the plaintiff is entitled to recover said margins as constituting money paid under an executory wager, a Court of law is the only forum in which that right can be adjudicated.

Appeal from a decree of the Circuit Court for Allegany County (BOYD, C. J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PEARCE, SCHMUCKER and JONES, JJ.

*Robert R. Henderson* and *W. Calvin Chesnut* (with whom were *Gans & Haman* on the brief ), for the appellant.

According to the custom of this bucket-shop business, whenever a customer gives an order for the purchase of certain stocks, he is required to pay the broker or proprietor of the shop $2 for each share of stock so ordered to be purchased. If the stock rises in price, the customer at once has the privilege of closing the deal, whereupon the broker must pay to the customer the difference between the market price of the stock at the time the order was given, and the market price at the time of closing the deal plus $2 per share, paid as a margin, less one-fourth of 1 per cent as a commission to the broker. If on the other hand, the stock declines in price, the broker has not the option to close the deal, but simply to notify the customer thereof, and call for additional payments on account as margins. The customer can comply with this by making said additional payments, and as long as the customer pleases, or has the ability to deposit further margins, he can keep the deal open. If, on the contrary, he declines or

fails to deposit additional margins on a falling market, the broker can then close the deal, and can call upon the customer to pay to him the difference between the quoted price of the stock at the time of the order, and the quoted price at the time of closing the deal, less the amount which the customer has paid by the way of margins. Of course, in a business of this kind, it is essential to the continuance in business of the broker that he should collect his margins in advance; otherwise, he would never be able to recover his winnings from the customers.

In this particular case Deneen and the other customers paid their margins in the usual way to Hartsock, who then generally deposited them in his individual account in the Second National Bank of Cumberland, and drew checks thereon from time to time for balances due Baxter, and had the amounts deposited to Baxter's account in the Third National Bank. In some few cases Hartsock deposited the monies paid to him as margins directly in Baxter's account. Whenever losses on deals were sustained by Baxter he paid the aggregate for the same for any particular day by check on his money in the Third National Bank in favor of Hartsock, and Hartsock then deposited the check in his own bank account, and therefrom personally paid the customers.

A careful examination of the opinion of the Court below shows that it embraces four propositions, some of fact and some of law. These are as follows:

1. The Court finds, as a fact, that it was agreed between the parties, the broker and the customers, that the money paid as margins should be deposited in bank and kept there intact until all deals on account of which the same was paid were closed; and further finds that the customers had some interest in this bank account, and that Baxter's holding of the same resembled a case where one holds property or money impressed with a trust, in other words, that Baxter was an implied trustee with respect to this bank account.

2. The Court further finds that the bank unconsciously occupied the position of a stakeholder with reference to this fund.

3. The Court further finds that the whole balance of eighteen thousand two hundred and fifty-three dollars in bank at the time of the filing of the bill had been paid in on account of deals which had not been closed, and that therefore it represented stakes put up on account of undetermined bets which were, therefore, still executory and not executed.

4. The Court holds that equity has jurisdiction on the ground that an injunction was made to prevent the fund from being paid over by the bank, and also on the ground that the bank was practically in the position of an interpleader ; and further, that an account was necessary to be stated to ascertain what particular portion of the bank's balance represented moneys paid by the respective customers of Baxter.

We deny each one of these four propositions.

1. As to the first, we say that the account represented moneys paid to Baxter's agent, and by him deposited unreservedly in Baxter's account, and that Baxter had absolute and unequivocal legal title to the money, and that the relation between him and his customers, so far as the bank account was concerned, was simply that of debtor and creditor, as the case might be, and not in any sense of the word a trustee.

2. We deny absolutely that the bank was either consciously or unconsciously a stakeholder in reference to this fund.

3. We say that under the particular nature of the transaction between the parties, to wit, the payment of money on account of margins, such payments of said margins was an absolute payment thereof, and to that extent at least represented a partially executed contract between the parties. We further say that the doctrine of *locus pœnitentiæ*, which is applicable to that form of gambling contracts, known, as bets or wagers, cannot apply to the particular facts of this case ; whether the deals between the parties were executed or executory is not of controlling importance.

4. We deny that equity has any jurisdiction of such a case as this. We assert the proposition that no suit at law or in equity will lie at the instance of a party who has paid money to another on account of a gambling contract to recover the same.

This is the substance of the case.   If such a suit cannot be maintained at law, equity would have no jurisdiction merely on account of the incidental benefits to be derived by way of injunction, account, etc., as the latter are only collateral to the relief asked.

We further assert that equity particularly has no jurisdiction in this case, because the plaintiff is in equal fault in reference to the subject-matter involved with the defendant.   The parties are *in pari delicto*, and the plaintiff does not come into Court with clean hands.

1. It cannot be argued that any of the customers had a right to draw on this money in the bank or any control over it, nor had any one customer the right to believe that margins paid by him would not be applied by Baxter to the payment of losses he might sustain on deals with the other parties.   It cannot be therefore contended that this fund was impressed with any trust for the benefit of any particular customer, and if not for any one, not for all.   The dealings between the parties show very clearly that out of this money losses were paid by Baxter from time to time.   The mere fact that Deneen was the largest customer, and at the time of the attachment had paid to Hartsock more money on account of margins on unclosed deals than then remained in bank, cannot impress any trust character upon the fund.   The plain and obvious truth of the matter is simply that the bank account was a general one kept by Baxter just as any merchant keeps an account. It was kept in Cumberland simply because it was necessary in order to induce trading from day to day to show the trade that Baxter had enough money to pay losses with.   As pointed out by the Court, in its opinion, Hartsock did say in answer to the question why the $10,000 was put in bank ; "as a matter of confidence, to inspire some confidence in the trade and for our general protection."   It is, however, entirely impossible to seize upon a loose statement of this character to impress any trust nature on the bank account.

2. The bank is not a stakeholder either in the general sense of the term, or in its legal significance.   Put this ques-

tion: Would the bank have been answerable to Deneen if, instead of his attaching the $18,000 balance, he had simply requested the bank to pay him, and notified them not to pay Baxter, and thereafter the bank had honored the $17,000 check mentioned in the evidence? Surely the answer to this question must be no, and equally surely therefore, the bank was not a stakeholder in reference to this money, according to the definition of this term. Again, it is apparent from the above that a stakeholder is one who holds a fund, which it is understood and agreed he is to apply in a certain way, according to the happening of a certain contingency. There is nothing in this case to show that the fund was deposited with the bank with any such understanding. The only authority that the bank had to make any disposition of the deposit was to honor checks drawn by Baxter. 23 *Am. & Eng. Ency. of Law*, 18; 8 *Ibid*, 999. .

3. It is true that the distinction between executed and executory gambling contracts is important with respect to the rights and liabilities of a stakeholder, but we contend in this case that the bank was not a stakeholder, and, therefore, the distinction is not of any real moment. From consideration of the nature of the contract in this case, we think it clear that the monies paid by the customers were *payments on account*, and not in the nature of stakes. *McClain* v. *Fleshman*, C. C. A., 106 Fed. Rep. 881.

The legal effect of the payments by customers on what is known as margins is that they are simply payments on account from the customer to the broker. The history of the development of the business shows this; inasmuch as at first it was understood that the securities should actually be bought, and the practice in reference to the payment of the margin was simply that the broker might have in hand a certain amount of money to pay on account of the purchase by him of the stocks to the person from whom he bought them.

The reason why money deposited with a stakeholder to be disposed of according to a future contingency can be recovered by either of the parties is that the possession of the stake-

holder is the possession of the parties themselves. He stands as joint agent for them. He has no property in the amounts deposited with him. He is simply a bailee of the stakes. The title still remains in the respective parties, and can be recalled by them at any time. There is no real consideration for the deposit with him. In the case of stock speculation on margin, such as we have here, however, the situation is very different. Here there is an absolute payment on account to the broker. The title to the amount paid as margins passes to the broker. In the ordinary case he uses it as his own money, and it is, in fact, his. He is simply indebted to that extent to his customer.

4. The main question of law in the case, is, *has equity any jurisdiction in such a case as this?* This necessitates some examination of the authorities. In the first place, it cannot be denied, and is, of course, admitted by all parties to this suit, and assumed by the opinion of the Court below, that the transactions between Baxter and his customers were gambling transactions within the eyes of the law. This has been repeatedly decided in Maryland in recent cases: *Burt* v. *Meyer*, 71 Md. 467; *Stewart* v. *Shall*, 65 Md. 289; *Cover* v. *Smith*, 82 Md. 686; *Billingslea* v. *Smith*, 77 Md. 504.

All these cases involve the dealings between stock brokers and their clients, and in all of them it was decided that dealings on margins where it was not the intention of either party that any stock should actually be bought and delivered, are gambling contracts on *which no action can be maintained.* In the first of these cases, *Burt* v. *Meyer*, 71 Md. 467, the suit was by a dealer or customer to recover monies which he had paid on account of margins, and by the defendant's fourth prayer, the jury were instructed that there could be no recovery if the jury found it was the understanding between the parties that no grain should actually be bought or sold. The opinion is very brief, and the point in the case cannot be appreciated without a careful reading of the whole report, including the letters offered in evidence. We confidently submit that the proposition decided in this case is that a custo-

mer who paid margins to the broker with no idea of receiving the actual securities cannot maintain an action against the broker for the recovery of the same. It is a gambling contract. It is void by law. It is against public policy, and the Courts will not allow their aid to be invoked to help the parties one way or the other, but leaves them where it finds them.

This suit is in substance merely an effort on the part of the customer to recover margins paid to his broker. If such margins could not be recovered in the case of *Burt* v. *Meyer*, they could not be recovered in this case. If a Court of law could not entertain a suit founded on such a transaction surely equity would not. We further point out that this is the main and substantial relief which is asked. It is the thing which was done by the Court in this case. That is, the money paid to the broker is by the effect of the decrees below, paid back to the customers. Surely, if such margins could not be recovered in a suit at law, equity cannot restore them simply on the collateral relief asked for by way of injunction and the statement of an account. The Court below refers to the case of *Gough* v. *Pratt*, 9 Md. 526, as authority for the proposition that equity will intervene in a matter of this kind. We submit, however, that no Maryland case can be found in which the proposition has been set forth that equity will enforce any rights growing out of gambling contracts. In the case of *Gough* v. *Pratt*, referred to, what equity did was to enjoin the enforcement of a judgment at law recovered on a bond given for a gambling consideration. To the same effect are the more recent cases of *Emerson* v. *Townsend*, 73 Md. 226; *Miller* v. *Gittings*, 85 Md. 601.

The effect of all the decisions is that neither law nor equity will enforce any rights claimed under gambling transactions, and further, that if any such rights are enforced in a Court of law, where the defence that the transactions were void because gambling transaction, has not been interposed, equity will intervene and enjoin the enforcement of the judgment.

An examination of the opinion of the Court below in this

case shows that it proceeds on the theory that there was an agreement between the parties that the money in the bank account should not be withdrawn by Baxter and that Baxter was endeavoring to violate this agreement by withdrawing the money by check, as he had the power to do, and that, therefore, equity would enjoin this manifest breach of agreement. Now, is it not perfectly clear that whatever monies did get into that bank account were deposited there in pursuance of gambling contracts or agreements between Baxter and his customers, and if the injunction decreed by the Court below is to be maintained, is it not a case where equity has endeavored to specifically enforce negatively by injunction an agreement between the parties *in reference to the carrying out of a gam-bling contract?* We call the Court's attention to what would be the effect of sustaining the decree in this case. It means the *supervision by Courts of equity of gambling agreements.* It means the establishment of a new branch of equity jurisdiction.

In the case of *Cover* v. *Smith*, 82 Md. 586, JUDGE BOYD says: "In this age of speculation and tendency to deal in large transanctions with but little capital invested, by means of what are called 'margins,' it behooves the Court to apply vigorously the well-established principles of law that forbid gambling in all forms, and to refuse relief to those coming before them, seeking to recover gains tainted with that crime."

And, of course, if relief will not be granted to the winner, neither will it be granted to the loser. The parties are *in pari delicto.*

In *Albertson* v. *Laughlin*, 173 Pa. St. 529, which is a sample of the cases of this nature, the Court says: "It does not matter, so far as the legal effect of payment is concerned, whether the loser in a gambling transaction pays his losses in cash, or negotiable securities. He cannot recover what he has voluntarily paid in either case. The winner could not recover from him by action in law, if he refuses to pay, nor can he recover his losses. The law will leave both parties just where it finds them, and will afford its help to neither. *A fortiori* should a Court of conscience turn away from an

illegal transaction, and refuse its aid either to the winner to compel payment of his gains, or to the loser who has paid his losses, to compel him to recover them back."

The case of *Dauler* v. *Hartley*, 178 Pa. St. 23, was much relied on by the plaintiff in the Court below, and is referred to in the Court's opinion, as being very applicable to the question under consideration. The plaintiff seems to have constructed his bill of complaint on the basis of that case. A careful examination of that case, however, shows that it is essentially different from this in one vital respect. In that case, it was found as a fact by the Master to whom the case had been referred, that the bank *was a stakeholder*, and it is further apparent from the facts of the case that the money was deposited in bank by the customers or traders under *the distinct agreement with the bank that the money should be held for all parties interested; the account was a conditional one, and the funds were not to be withdrawn from the bank by the broker without the consent of the parties who advanced the same. The bank expressly agreed to hold the money on these conditions* This was, therefore, a clear case of money deposited with a stakeholder.

*David J. Lewis* (with whom were *Benj. A. Richmond* and *George A. Pearre* on the brief), for the appellees.

The money in the bank was a stakeholders' fund prepared by parties to the gamble made up by Baxter's $10,000.00 on one side and the money of Deenen and other dealers on the other, all mingled in one account in one fund and all dealt with, both to receive stakes and pay out stakes by the respective parties to one of the stakeholders' fund. This is made out fully by the oral evidence, but apart from the evidence it is patent from the written correspondence of the parties. It was further peculiar in the fact that Hartsock, as all hands admit, was entitled at all time to know the state of the account and to disclose the state of it to the dealers, thus showing conclusively that the dealers had an interest in that account. When Hartsock sent his telegram saying: "Your

Mr. Tobin said when here that you did not take down margins until trades were closed or exhausted. Is this so? Answer." Mr. Baxter replied on Sept. 30th: "We will always have more money than sheet is worth there. We don't want draw any money down or have not done so. Ask the bank for our balance." This telegram of Hartsock's and this answer of Baxter clearly amounted to an arrangement between Baxter and the dealers through Hartsock, that the common fund was to remain in hand until the deals were closed or exhausted. If the telegram of Baxter did not mean that, it meant nothing. It was certainly intended to convey that impression to the dealer and all the testimony of the dealers show that they so understood it and so acted upon it.

It being clear, therefore, that the bank was in fact a stakeholder, not only because it held a joint stake, but because it was so understood by the parties to the stake, the next question raised by the appellant, is whether the bank knew it was such a stakeholder. We regard that question as wholly immaterial under the facts of this case. If the bank in point of fact was a stakeholder the further fact, if true, that it did not know it was a stakeholder cannot effect the relation and rights existing between the other parties. It is perfectly conceivable that two parties to a stake might make a deposit with the third party and constitute him a stakeholder without his knowledge that he was such a stakeholder, but the relation between the bettors would be the same whether the third party knew of such relation or not. *Alford* v. *Burk*, 68 Amer. Dec. 449.

The decided preponderance of evidence goes to show that the Third National Bank did know the nature of that deposit, that it was a stakeholder's fund, and that it was a stakeholder thereof. By the various transactions, Hartsock's letter, the testimony of the cashier, and of Mr. Humbird, the director, the face of the account itself, the manner in which the money was put in and the way it was drawn out it appears that the bank not only was put on notice of the nature of this deposit but had specific knowledge of the nature of the deposit and

the reasons therefor, and this is so notwithstanding the general denial on the part of the bank of this specific knowledge which is the only evidence on that side of the question.

It is also not a matter of controversy that all the money, shown by the testimony to have been over $18,000.00, the special amounts of which are set out on the tickets filed in the case, which George E. Deneen and the other dealers put up with Hartsock on these deals, went into this account. It was first handed to Hartsock, deposited by him generally, but not always, in the Second National Bank, and then drawn from the Second National Bank by Hartsock, and deposited in the Third National Bank.

It is clear and undisputed that the only part of the stakes which Baxter put up was the $10,000.00, the first deposit, and the only money drawn out by him except those sums which went to pay the dealers, was the $15,000.00 New York draft which Baxter got. He, therefore, got back all his $10,000.00 and $5,000.00 of the dealer's money. It is therefore, a matter of dead certainty that every dollar still left in the bank of the $18,252.66, and which is now still in the hands of the bank, is money wholly made up of the deposits put up by Swartzwelder, Hetzel and Deneen, and not a cent of which was put there by Baxter. The whole fund in controversy, therefore, is entirely made up of the stakes of appellee and the other dealers mingled together among themselves exclusive of any contribution thereto by Baxter. This is clearly shown by the tessimony of Hartsock and others and will not be disputed.

And finally it is a fact that all the money put up by the appellee on his deals and which is in that fund, was put up on deals and bets and wagers, which wagers were undetermined at the time Deneen repudiated the transaction, got out. the attachment and were not determined until long thereafter, when Baxter went into Hartsock's office and ordered George Deneen's trades closed out. This, however, was long after Deneen had given notice both to Baxter and the bank by his suits and otherwise of his intention to repudiate.

Inasmuch as the fund in the bank has been contributed to by a number of creditors and the exact amount put in by each is unascertained and the exact proportion to which each is entitled to the fund remaining, cannot be known without such accounting; the plaintiff in fact has no remedy at law at all. The bank holds the fund as trustee for those entitled and is in the position of the party in interpleader proceedings holding a fund which several parties claim. The bank here disavows all interest in the fund. It is claimed by Baxter, it is claimed by Deneen, it is claimed by Hetzel and others. The only tribunal, therefore, competent to take account of all these matters, declare the trust and work out the trust and the equities of the parties having an interest in the trust fund, is a Court of equity.

Besides equity clearly had jurisdiction in the first place to restrain Baxter from withdrawing the fund from bank on the ground of fraud and having once acquired jurisdiction for this purpose it may proceed to determine the whole cause.

It is well settled that either party to a gambling contract may repudiate the same while it remains executory or unexecuted, or before the event has been determined, and demand the return of the stakes. This is on the ground that a *locus pœnitentiae* exists. *Dauler* v. *Campbell*, 178 Penn. St. 23; 14 *Am. & Eng. Ency.*, 2nd ed. 632, note 7; *Cotton* v *Thurland*, 5th Term Report 405; *Smith* v. *Vickmore*, 4 Taunton, 474. If the parties to an illegal wager repent and desire to withdraw before the wager has been decided, they may recover their stakes from each other, or from the stakeholder if one has been employed. *Johnson* v. *Russell*, 37 Cal. 670.

Money deposited with a stakeholder by a party to a wagering contract, may, while in the hands of such stakeholder, be recovered from him by the depositor, even after the event has taken place, and that adversely to such depositor. *Wheeler* v. *Spencer*, 15 Conn. 28. Before a decision either party may recover back his stakes. *Jacobs* v. *Walton*, 1st Har. 496 Del.

Where money is staked on a wager is still in the hands of a stakeholder, or while it is in *transitu*, either party may re-

claim it, whether the event has happened or not.    *Vischer* v. *Yates*, 11 Johns. 23.    As between the parties to an illegal wager, where money or other property has been advanced by one to the other upon the making of the contract, the wager is recoverable at any time before the event happens.    *Tarleton* v. *Baker*, 18 Vt. 9; 44 Am. Dec. 356.    In all cases where money has been lost by gaming, but not paid, equity will interfere to restrain its collection, as between the original parties to the contract.    *Roberts* v. *Taylor*, 7 Port, 251.

A stakeholder holds the money deposited as a bailee, so that the depositor can recover his deposit at any time before it is paid to the winner.    *Hardy* v. *Hunt*, 11 Cal. 343, 70 Am. Dec. 787; *Dewees* v. *Miller*, 4 Har. 347; *Shannon* v. *Baumer*, 10 Iowa, 210; *Stacey* v. *Foss*, 19 Me. 335; *Morgan* v. *Beaumont*, 121 Mass. 7; *Beaver* v. *Bennett*, 29 Neb. 812; *Bates* v. *Lancaster*, 29 Tenn. 134.    In wagering contracts when the impending event is undecided, and after the event, as against a stakeholder who has been notified not to pay the thing lost to the winner, the owner may come and disaffirm the contract, and recover his property.    *Guthman* v. *Parker*, 40 Tenn. 233.    Money deposited in an illegal wager may be recovered from a stakeholder, who has paid it over after notice.    *Perkins* v. *Eaton*, 3 N. H. 152; *Wood* v. *Wood*, 7 N. C. 172; *Alexander* v. *Mount*, 10 Ind. 161.

A Court of chancery has jurisdiction to compel a stakeholder to return money deposited with him on a wager.    *Dauler* v. *Campbell*, 178 Pa. St. 23.    Money lost at gaming may be recovered back in a Court of equity, where the bill is brought within five years from the time of the loss.    *McKinney* v. *Pope's Admins.*, 42 Ky. 93.    Equity has jurisdiction to order that bonds, notes and mortgages entered into so executed by any person, where the whole or any part of the consideration is a gambling debt, be delivered up and cancelled.    *Taunton* v. *Arnold*, 42 N. J. Eq. 60; *Rucker* v. *Wynne*, 39 Tenn. 617.

In *Smith* v. *Bruning*, 2 Vernon, p. 392, where there was a marriage brokerage bond, the Court not only decreed that the

bond be given up, but that a gratuity of fifty guineas actually paid should be refunded.  See also *Synes* v. *Huges*, L. R. 9 Eq. 475; *Gough* v. *Pratt*, 9 Md. 526.

Even one of the parties to the bet may be the stakeholder, responsible as other stakeholders.  *Manning* v. *Purcell*, 7 De. G. M. & G. 55, 24 L. J. ch. 522.  Either party to a wager or bet may repent before the event is decided and may recover his part of the bet from the other.  *Gridley* v. *Dorn*, 57 Cal. 78; *Hardy* v. *Hunt*, 11 Cal. 343.  Before a decision either party may recover his stakes "even out of the hands of his opponent."  *Visher* v. *Yates*, 11 Johnson, p. 23; *Nace* v. *Boyer*, 30 Pa. St. 110; *Moore* v. *Trippe*, 20 N. J. 263.

The depositary cannot in general dispute the title of a depositor and set up title in a third person, etc.  But where the depositor is not the rightful owner of the property, and the owner claims it or forbids its delivery to the depositor, the depositary is justified in refusing to deliver it.  9 *Am. & Eng. Ency. of Law*, p. 266; *Whetherly* v. *Straus*, 93 Cal. 263; *Bates* v. *Stanton*, 1 Duer, N. Y. 79.

A bank is liable to the true owner of the fund deposited with it without regard to the nominal depositor, provided notice be given it by the owner before the fund is paid over to the depositor.  *Union Bank* v. *Johnson*, 9 Gill, N. J. 297; *Utica Bank* v. *McKinster*, 11 Wend. 473.

It is wholly immaterial whether Baxter strictly intended to make the bank a stakeholder of the funds of the plaintiff's deposit with it or not.  The money was put up on a wager.  It was put in the bank and had not yet reached the pockets of Baxter.  It was in *transitu* so far as he was concerned.  It had not yet reached his hands and his possession.

It will be contended for Baxter that the money put in the bank here in his name was the same as though it had been paid over to Baxter into his hands, but this argument proceeds upon another misconception of the relation between the bank and Baxter.  When Hartsock put the money in the bank to Baxter's credit the money immediately became the property of the bank and the further relation between the

bank and Baxter was merely one of debtor and creditor. This would have been so on the face of the account had there been no intervention on the part of Deneen, but when Deneen intervenes and shows that the money delivered to the bank was his money, to which he is now entitled, the credit in the bank as a matter of law is no longer a credit due to Baxter, but is a credit due to Deneen. The credit results to Deneen and not to Baxter, and a Court of equity having the fund in its control in the hands of the third party can declare to whom the trustee shall satisfy that credit accordingly. *Bank* v. *Mason*, 95 Pa. St. 117; *Harrison Bank* v. *Tyler*, 3 W. S. 373; (2nd) 3 *Am. & Eng. Ency.* p. 832, note 1, and cases cited; *Swift* v. *Williams*, 68 Md 249.

It is desired to accentuate two propositions: *First.* When a wager or bet has been made and the money "put up" anybody who holds it is a stakeholder. Such stakeholder may be a third party, or indeed, either of the bettors. It is impossible for any person to hold the stakes or part of them (while the transaction is open) without becoming a stakeholder, as a conclusion of law and reason alike. Just as it is impossible for anyone to hold trust funds without becoming a trustee as to such fund.

*Second.* It is immaterial whether the stakeholder has knowingly accepted the office or not. His character *results* from the circumstances of his situation. When the facts become known to him he holds the wager (or money paid him on an illegal contract) subject to the *locus pœnitentiae* of the depositor. If demand is made upon him before he has actually paid the money over he must repay it to depositor. When the depositor demands its return he does it in *repudiation* of the unlawful contract. But if the other party should sue for it he can proceed only by *affirming* the illegal agreement upon which he bases his claim. Thus Deneen *repudiates* his illegal executory agreement, and recalls his stake from the actual holder before the event has been determined. But Baxter, in order to recover from the stakeholder, must *stand* on the terms of the illegal agreement itself. He has *no title* to the fund with-

out proving a *consummated* unlawful agreement under which it might have become his property. He proceeds not by *repudiating* but by affirming the agreement prohibited by law.

Did Deneen put up his wagers, and does this fund consist of wagers brought together in futherance of an illegal contract? Can there be any doubt about this under all the testimony of all the witnesses. Not only does the fund consist of wagers exclusively, but it appears conclusively that Baxter and Company have withdrawn all their wagers and that the money in the wagers' fund was put up entirely by the bettors here.

SCHMUCKER, J., delivered the opinion of the Court.

The appellee Deneen in the bill filed by him in this case declares his purpose to repudiate certain contracts, made with the appellant Baxter a stock broker, for speculating in stocks on margins and asks the Court to compel the return to him of the margins paid by him to Baxter under the contracts. He also asks for an injunction to prevent the withdrawal from bank by Baxter of certain money standing there to his credit upon the ground that it consists of the margins so paid.

Both parties to the record admit on their briefs that the contracts in question were mere gambling contracts predicated upon the expected rise or fall of the stock market and were not intended to be executed by actual purchases or sales of stocks. They both also concede the proposition that equity will not lend its aid to enforce gambling contracts but the appellee contends that his bill does not ask the Court to enforce any contracts but simply to compel the return to him of the margins which he paid upon gambling contracts that he now repudiates.

The material facts of the case as we find them from the record may be stated as follows:

Early in September, 1902, Baxter at his office in Pittsburg, Pennsylvania, informed Deneen that he was considering the desirability of opening what is commonly called a "bucket shop" for speculating in stocks on margins in the city of Cumberland where Deneen resided. A similar business had

theretofore been conducted in Cumberland by one Cummings who is said to have decamped with all the funds of the business thereby inflicting serious losses upon Deneen and other persons who were his customers. Deneen replied to Baxter that it would be useless to send a stranger there, as he could get no trade, and advised him to get H. H. Hartsock who had been Cummings agent to take charge of the office, if he determined to open one, and to permit Hartsock to handle the money. To this Baxter replied that he would not put money in Cumberland in any other name than his own but he was willing to do anything else and would not object to permitting to be known how much money he had in bank in Cumberland from time to time.

Within a few days thereafter Baxter opened a bucket shop in Cumberland and placed it in charge of Hartsock as manager. He at the same time deposited $10,000 in his own credit in the Third National Bank of Cumberland and instructed the bank to inform Hartsock from time to time of the amount standing to the credit of the account. Hartsock thereafter deposited to the credit of the bank account, thus standing in Baxter's name, all margins received from customers in the course of the business at the Cumberland office. When the deal of any customer at the office was closed the balance, if any, due to him was paid out of this money standing to Baxter's credit in the bank which was drawn out by checks signed by Baxter and not by Hartsock.

Deneen, who was a frequent if not habitual speculator in stocks on margins at once began operating through the Cumberland office and soon became its chief customer. Within a few days after opening the office Hartsock, its manager, wrote with the knowledge of Deneen the following letter to Baxter, his principal.

"Cumberland, Md., Sept. 10th, 1902.
Mr. A. B. Baxter,
        Pittsburg, Pa.

Everybody seem to be pleased with our arrangements except on one point and that is a weak one and makes the whole structure without a good foundation and that is you can with

draw all the funds in bank at any time and we are left as we were last week by Cummings & Co.

Cannot you fortify the point and then we can get the trade? The President of the 3d Nat'l B'k thinks you should do so, in fact unless it is done, certain large and the best trade cannot be secured and it may be hardly any business can be retained, as there is an effort being made to have a N. Y. Stock Exchange open an office here which would get that trade at least.

Let me hear from you on this matter and favorably: The Cumberland trade has had a hard knock and something out of ordinary must be done to restore confidence.

Very truly yours,<br>H. H. Hartsock."

To that letter Baxter sent the following reply which was shown to Deneen.

"Pittsburg, Pa., Sept. 11th, 1902.

H. H. Hartsock, Esq.,
    Cumberland, Md.
Dear Sir:

Your favor of 10th inst. rec'd & noted. We talked the matter of which you speak over with both Mrss. Deneen when they were here & told them *that we would not consent to anybody controlling our funds.* There is no doubt that a good many of your people there feel very badly over the treatment received from Cummings & Co. I told them (Mess. Deneen), *to inquire as to our standing here, not only at the bank, but on the street generally,* & from other brokers & I am satisfied that they would find that we are regarded in a different manner from which the people regarded Cummings & Co.

We would like to have your business; we could not under *any circumstances agree to have anybody interfere with the management of* our finances.          Yours truly,

A. B. Baxter."

Subsequently after Deneen had been trading for sometime with the Cumberland office he was called by it for over $6,000 additional margins. When he responded to that call with the money asked for, he said to Hartsock that his understanding was that all margins were to remain in bank until the trades for which they were put up were closed or the margins were exhausted and he desired to know something more about it. Hartsock thereupon telegraphed to Baxter for information on

the subject and received from him a reply saying "*We will always have more money than the sheet is worth there. We don't want — draw any money down or have not done so. Ask the bank for balance.*"

The precise meaning of the technical expression "more money than the sheet is worth" was the subject of a conflict of testimony, but it is not necessary in the view which we take of this case to settle that controversy.

After these occurrences Deneen continued to deal heavily with the Cumberland office in similar stock transactions until October 7th, 1902, up to which time he had paid to Hartsock $18,253 as margins on deals then remaining open and unfinished. At that time $33,253 stood to the credit of Baxter on the account already referred to in the Third National Bank. On that day, October 7th, just before the bank closed, Baxter drew out of it $15,000 through an agent whom he had sent to Cumberland for that purpose, and who on the next morning presented a check for $17,000. The bank refused to pay this check, as Deneen, having gotten wind of Baxter's purpose to withdraw the money, had filed the present bill and procured an injunction thereon restraining the bank from paying out any of the money standing to Baxter's credit until the further order of the Court. Deneen also sued out of the law side of the Court an attachment against Baxter for the recovery of the $18,253 of margins and laid it in the hands of the bank.

The bill of complaint alleges that all of the contracts were entered into by the plaintiff and the margins thereon paid by him upon the distinct understanding and agreement between him and Baxter with the knowledge and assent of the bank that the margins were to remain in the bank until the contracts on which they were paid were closed. The evidence, however, does not satisfy us that Baxter made any positive agreement to do more than keep money enough there to make the sheet good, whatever may be the exact meaning of that expression, although he disclaimed any desire to withdraw the balance of his account. There is no evidence at all that the bank had

any knowledge of or gave any assent to the arrangement or understanding between Deneen and Baxter relative to the retention of the money in bank.

The bill also charges that the drawing of the $15,000 out of bank by Baxter and the attempted drawing of $17,000 more constituted flagrant violations of the agreement, under which Deneen had paid his margins, and that it had been done with a deliberately fraudulent intent and purpose to remove the money from this State and convert it to his own use and cheat and defraud Deneen and the other customers who had dealt with him at Cumberland upon the same terms. It is also averred that the other persons who are named as defendants had similar stock dealings with Baxter and may be interested in the balance to his credit in bank, and also thathe is financially irresponsible.

The prayer for relief asks for a decree for an accounting between the parties to the suit in respect to their relative rights to the money in bank to Baxter's credit, and for an injunction to restrain the bank from parting with the money *pendente lite*, and for general relief. An injunction was granted as prayed and the defendants made a motion for its dissolution.

The bank's answer admits the making of the several deposits with it and that it was instructed by Baxter to let Hartsock know the balance whenever he wished, but it flatly denies that it had any knowledge of any agreement between Deneen and Baxter as to the deposits or the uses to which they were to be put.

Baxter's answer admits the dealings on margins in stocks with Deneen but insists that it was definitely understood that the margins were to be paid by Hartsock to him for his own account to be dealt with as he saw fit, and that he only agreed to keep as much money in Cumberland as the sheet was worth and he avers that he did keep that much money there.

Two other defendants, Botchford and Swartzwelder, answer the bill admitting that they had dealings with Baxter through Hartsock but do not state the particulars thereof and

they submit their rights to be determined by the judgment of the Court.

The Court below by its decree of May 23rd, 1903, over-ruled the motion to dissolve the injunction, and held the plaintiff to be entitled to the relief for which he prayed and sent the case to the auditor to state an account. An account was stated and returned by the auditor distributing the net balance of the money in bank to Deneen to the extent of $18,096.86 to Hetzel to the extent of $68.60 and to Swartzwelder to the extent of $88.20. This account was ratified and Baxter appealed from the decree of May 23rd, 1903 and also from the order ratifying the account.

We do not agree with the conclusion arrived at by the learned Judge below. It plainly appears by the record that Baxter, when urged by Deneen and Hartsock to keep some money in bank at Cumberland upon such terms that he could not withdraw it at will, positively refused to do so saying to them that he would under no circumstances agree to have anybody interfere with him in the management of his finances. The most that he could at any time be induced to agree to was to keep more money there than the sheet was worth accompanied by the statement that he did not wish to draw down any money.

With these facts staring him in the face Deneen did not require the money supplied by him for margins to be retained under the joint control of Baxter or Hartsock and himself or to be held by some third person as stakeholder, nor did he retain any lien thereon. He deliberately paid them over absolutely to Hartsock knowing that they would be deposited in bank to the credit of Baxter and would thus pass under his absolute control. He thus voluntarily parted with his title to the money and relied solely for his protection upon the personal agreement of Baxter which he himself asserts formed a material part of his gambling contracts.

He now by his bill in this case in effect asks a Court of equity to compel the performance of this agreement. He does not in terms ask for a decree for a specific performance but

he does so in effect, for the avowed purpose for which he asks an injunction against the bank is to prevent Baxter from violating his agreement by withdrawing from the bank the balance of the money still standing to his credit.    To prevent Baxter from violating his agreement is to all intents and purposes simply to compel him to perform it.    Equity regards the substance of a transaction and not its mere form.    Nor can we yield assent to the appellee's contention that the money in bank should be treated as affected by a trust or subject to an equitable lien in his favor without in effect enforcing the agreement, for such a trust or lien must rest upon or arise out of the terms of the agreement which the appellee insists required that the money should remain in the bank until the deals in connection with which it was paid were completed.

This Court has repeatedly held that even the law does not permit actions to be maintained on contracts like those now under consideration for ficticious purchases and sales of stocks because they are regarded as gambling contracts.    *Stewart* v. *Schall,* 65 Md. 289; *Burt* v. *Myer,* 71 Md. 467; *Billingslea* v. *Pride,* 77 Md. 519; *Cover* v. *Smith,* 82 Md. 614.    Much less does equity lend its aid to their enforcement.    A Court of equity undoubtedly has jurisdiction to trace money or property unlawfully obtained from its true owner and to intervene and secure it for him by impounding it by injunction or giving him a lien on it but it will not exercise that jurisdiction on behalf of one who was himself a voluntary participant in the unlawful transaction by which he lost his money.    The doctrine that equity will not actively interpose for the relief of a party who has been a *particept criminis* in an illegal or fraudulent transaction is not only one of general acceptance but it has on different occasions received the direct sanction of this Court. *Roman* v. *Mali,* 42 Md. 512; *Snyder* v. *Snyder,* 51 Md. 80; *Brown* v. *Riley,* 72 Md. 489.

This rule as was said in *Roman* v. *Mali* by former CHIEF JUDGE ALVEY, "is most salutary and conservative as a means of suppressing illegal and fraudulent contracts and nothing should be done by the Courts to weaken its force or operation."

If Deneen desires to repudiate his gambling contracts and sue Baxter for the recovery of the margins paid on account of them, as constituting the stakes of executory wagers a Court of law is the appropriate forum in which to test his rights in that respect. Conceding for the sake of the argument without so deciding that he would be entitled to recover in such a suit at law, we see no special circumstances in the facts appearing in this record which should induce a Court of equity to depart from the salutary rule to which we have already referred and intervene in his behalf. The bill alleges that a number of persons named as defendants were similarly interested with the plaintiff in the money in bank and that an accounting between all parties interested would be necessary in order to determine their conflicting interests and to prevent a multiplicity of suits at law. But only two of those persons answered the bill and they declined to state what transactions they had had with Baxter or the circumstances under which they were made and simply in the most general terms submitted their rights to the determination of the Court. After the case was sent to the auditor Swartzwelder, one of the defendants, testified that he had put up $90 with Hartsock on a deal and that he saw no other way to get back his money than to claim a percentage of the money in bank. Another witness Hetzel testified that he had put up $70 as margins with Hartsock on some deals but had afterwards dropped the deals. In our judgment the facts disclosed by this evidence afforded no sufficient ground upon which to rest the jurisdiction of a Court of equity in a case like this.

The case of *Dauber* v. *Campbell*, 178 Pa. St. 23, 35 Atl. R., in which a Court of equity did intervene for the relief of persons who had put up money to be used as margins in stock gambling adventures, was much relied on by the appellees, but it is distinguishable from the one at bar. In that case a person, to whom a number of individuals had entrusted money to be employed in speculation in stocks, put all of the money in the hands of a banking firm, to the credit of the broker through whom the dealings were to be made, *upon the*

*express understanding that the bankers were not to allow the broker to draw any of the money without the consent of the depositor.* There were many deposits and still more numerous withdrawals of money which was applied to different stock dealings.   The Court there held the controversy to be over a resulting balance in which many persons were interested and took jurisdiction of the case because the remedy at law would have been inadequate.   Under the circumstances of that case the depositors of the money not only had retained control over it but were the actual owners of the balance remaining in the hands of the bankers.   It was quite a different case from the one now before us in which the plaintiff voluntarily paid over the margins to the broker in reliance upon a mere personal agreement the practical enforcement of which is essential to affording him the relief which he now seeks.

Nor will the Court exercise its equitable powers at the suit of Deneen to prevent Baxter from violating his agreement, to allow the money to remain in the bank at Cumberland, upon the ground of preventing the accomplishment of a gross fraud on his part by its withdrawal from bank and its removal from the limits of this State.   The same difficulty lies in the way of the Courts actively interfering in any manner which would practically give to Deneen the benefit of the enforcement of any of the provisions of these gambling contracts into which he voluntarily entered without oppression or compulsion and with a full knowledge of their nature and effect.

The decree and order appealed from will be reversed and the bill dismissed.

*Decree and order reversed and bill dismissed with costs.*

(Decided December 4th, 1903.)

McSHERRY, C. J., dissented and delivered the following opinion.

After a careful examination of the record in this case, I find myself unable to agree to the conclusions reached by the majority of the Court, and though it is exceedingly distaste-

ful to dissent, I am constrained to do so for the reasons which
I will now briefly state.    Without narrating the facts dis-
closed by the evidence, it is sufficient to say that the litiga-
tion had its origin in a gambling transaction between the ap-
pellant and the appellees.    The gambling transaction was a
betting on the rise or fall of the market price of stocks and
was made between some very foolish men, on the one side,
and, according to the evidence, a very tricky man, on the
other side.    The appellant conducted in Cumberland, what
is known as a bucket shop.    The foolish people bet on the
market price of stock and put their money in the hands of
the bucket shop proprietor.    They might just as well have
bet their money against loaded dice or marked cards.    The
money which they put up was deposited in the name of the
bucket shop proprietor in the Third National Bank of Cum-
berland, to abide the result of the bet, but it did not, even
under the terms of the contract between them, thereby be-
come the property of the appellant or cease to belong to the
appellees, at least until the gambling transactions were actu-
ally closed and the money was in fact paid over by the stake-
holder to the winner.    Before the event had occurred upon
which the wager depended, the appellees rescinded their con-
tract and demanded from the stakeholder, The Third National
Bank, a return of the money they had staked.    They did
this by way of attachment, and they followed that proceeding
by filing a bill in equity to restrain the stakeholder from pay-
ing to the appellant the money held by the bank.    The Court
below decreed that the money belonged to the appellees and
made the injunction perpetual.    As I understand it, a major-
ity of this Court now holds, that the decree thus passed was
erroneous, because both parties to the gambling transaction,
namely, the foolish men, on the one side, and the tricky man,
on the other, were in equal fault, and being in equal fault, the
Court will leave them where they have placed themselves and
will give its aid to neither.

That conclusion seems to me to be the contrary to the
whole current of judicial decisions both in England and in

this country.   The doctrine of *in pari delicto* cannot possibly, it seems to me, have any application to the situation disclosed by this record, and for two reasons.   *First:*  In a sense both parties to the gambling transaction were equally in fault for violating the law in making these bets, but there the equality of fault comes to an end.   Their conduct was not criminal or immoral, but it was illegal.   The appellees besides acting illegally were guilty of folly just as they would have been, if instead of betting on the rise and fall of the market, they had bet against loaded dice or marked cards; but the appellant, if the evidence adduced be worthy of credit, was involved in a scheme to defraud, which, of course, included a degree of moral turpitude which cannot be ascribed to the appellees. After the funds had been deposited with the stakeholder, to be held under stipulated conditions, the appellants surreptitiously endeavored to withdraw the funds that remained in the custody of the stakeholder after secretly checking out a considerable portion of the money that he had agreed should remain on deposit in the Third National Bank.   I fail to see, in the light of these circumstances, how the folly of the appellees can be said to be on a footing of equality with the turpitude of the appellant, and if there is no equality in this regard there can be no such equal fault as to justify the application of the doctrine that where the plaintiff and defendant are *in pari delicto* the condition of the defendant is the better.   There is a distinction between contracts which are immoral or criminal and those which are simply illegal and void. To the latter class gambling contracts belong.   They are made void by the Statute of 9 *Anne*, ch. 14.   In *Vischer* v. *Yates*, 11 Johns. R. 23, CHANCELLOR KENT said: "And the Courts take a distinction between contracts that are immoral and criminal and such as are simply illegal and void.  *Assistance is usually given the party in the latter cases to recover back his money;* and this Court lent such assistance in the case of *Mount, &c.,* v. *Wates,* 7 Johns. 434."   But beyond this the policy of our statutory law is distinctly against the application of the *in pari delicto* doctrine to gambling contracts, and

that doctrine furnishes no defense to an action brought by the loser to recover back money won from him and actually paid over to the winner.    By the *Code, Art. 27, sec. 127*, it is enacted that "any person who may lose money at a gaming table, may recover back the same as if it were a common debt."    And *sec. 128* provides that "All games, devices and contrivances at which money   *   *   *   *   shall be bet or wagered shall be deemed a gaming table within the meaning of the six preceding sections."    And by *sec. 130* it is declared that "the Courts shall construe the preceding sections relating to gambling and betting, liberally, so as to prevent the mischiefs intended to be provided against."    Surely a defendant who has been sued for money which he won from the plaintiff by gambling could not successfully invoke as a defense the maxim *in pari delicto potior est conditio defendentis.* Why should he be able to do so in a Court of equity?

*Secondly:* But in addition to this I have never known it to be suggested that a man who bets and then recants and repudiates the transaction whilst the wager is still in the hands of the stakeholder, was precluded from recovering the money he had staked, if the holder of the stakes refused, upon demand, to return it.    This, if authority were needed for the proposition, has been explicitly decided by the Supreme Judicial Court of Massachussetts in *Morgan* v. *Beaumont*, 121 Mass. 7.    That case arose in this way:  The defendant, prior to May 22nd, 1875, received of the plaintiff the sum of one hundred dollars, as a stakeholder on a wager between the plaintiff and one Woodward, upon the result of a horse race which actually took place on May 22nd, 1875.    This money was to be paid to the winner of the bet, after the race.    After the race, while the money was still in the hands of the defendant, the plaintiff, claiming that the race was not fairly had and that the decision of the judges of the race was not fairly made, forbade the defendant paying the money to Woodward, and requested the defendant to pay the same to him, which the defendant refused to do.    Afterwards, the money still remaining in the defendant's hands, the plaintiff commenced

this action.   The defendant well knew of the wager, and knew that the deposit of money was made in aid of illegal trotting and horse racing; and, at the time of the racing, both the plaintiff and defendaut were present, encouraging it." The Court speaking by CHIEF JUSTICE GRAY thus disposed of the controversy: "The wager was illegal, the winner had no right to the money, the stakeholder was a mere depositary, and the plaintiff, having demanded the money before it was paid over, was not *in pari delicto*, and was entitled to recover his deposit from the stakeholder, whether it was still in his hands, or had been paid by him to the winner after notice from the plaintiff not to do so.   The fact, insisted upon at the argument, that the defendant knew of and promoted the illegal wager, affords him no protection.   *White* v. *Franklin Bank*, 22 Pick. 181– 189; *McKee* v. *Manice*, 11 Cush. 357; *Love* v. *Harvey*, 114 Mass. 80; *Fisher* v. *Hildreth*, 117 Mass. 558."

The jurisdiction of a Court of equity in Maryland to grant relief in a case like this is clear, unless *Gough* v. *Pratt*, 9 Md. 526, and several cases which have followed it, be treated as flatly overruled.   In the case just cited a bill was filed by Gough for an injunction to restrain execution of a judgment recovered against him on a bond, upon the ground that the consideration of the bond was money won in betting and gambling at cards.   The bond was given by Gough to Sollers who was named as the payee therein, and who, as was alleged, had won at cards from Gough $869, the amount payable on the bond.   The bond was assigned by Sollers to James Kent and at its maturity suit was instituted in the name of Sollers for the use of Kent against Gough and judgment by default was subsequently entered thereon.   Thereafter a *fieri facias* was issued upon the judgment.   Thereupon Gough filed his bill against Sollers and Kent to restrain an execution of the judgment, upon the ground above stated.   Kent being dead, his administrator, Pratt, appeared and demurred to the bill. It was insisted that a Court of equity had no jurisdiction to restrain execution of the judgment, because first, the bond was not void; and secondly, because even admitting it to be void,

as between Gough and Sollers, still Kent being an innocent purchaser for value without notice of the gambling transaction, was entitled to enforce the judgment. But this Court following closely and unequivocally adopting, the opinion of the late CHIEF JUSTICE TANEY in *Thomas, trustee of Lloyd*, v. *Watson*, decided in the Circuit Court of the U. S. for the District of Maryland, held, that the bond was void under the statute of 9th *Anne.* ch. 14, which was then and still is in force in Maryland : That being void, equity had jurisdiction to restrain its payment even though it had been reduced to a judgment; and finally, that as the *circulation* of gambling bonds is an evil no less to be discountenanced than the *giving* of them, a holder thereof by assignment for value without notice of the illegal consideration, was in no better condition to collect the money, apparently due on the bond, than the payee himself would have been. In the course of the very lucid opinion of CHIEF JUSTICE TANEY above referred to and distinctly adopted by this Court in *Gough* v. *Pratt*, it was stated by that eminent and distinguished jurist : "And as regards a security for money lost by gaming, it was indeed said by LORD TALBOTT that it could not be recovered, both parties being equally in default. But that point did not arise in the case before him and was an *obiter dictum*, when deciding upon a question of usury and the point was decided otherwise in the case of *Rawden* v. *Shadwell*, Amb. 269. In the last mentioned case a bond had been given for money lost at play and part of the money paid upon the bond, yet the Court upon the bill filed for that purpose, decreed that the bond should be delivered up to be cancelled and the money repaid. Indeed there can be no sound reason for distinguishing securities for money won at play, from securities founded in usury, so as to give any advantage to the former over the latter, for they are both prohibited by law, both contrary to its settled policy. And while the laws against usury are intended to protect the necessitous against the oppression of the money lender, and against hard and ruinous contracts, forced upon them by their wants; the laws against

gaming are founded upon a policy equally sound and clear and are intended to discountenance and discourage a vice injurious to society and often most ruinous to the individual. If therefore the money had been paid by Lloyd upon these two notes, it is evident the complainant might by a bill filed have recovered it back; and if the Court of Chancery would have interfered after the money had been actually paid, is there any principle of equity which will prevent it from interposing where the party has omitted to defend himself at law and confessed a judgment. * * * If it will lend its aid to a party after he has acknowledged the justice of a debt by the payment of the money there can be no sufficient reason for refusing to interpose where the party has omitted to make the defense in an action at law and acknowledged the debt by confessing the judgment. In either case the Court acts to prevent the party from retaining an advantage which he has obtained under a contract forbidden by law and to uphold an established public policy intended in the one case to guard against oppression and in the other to suppress a vice injurious to society. * * * When the public policy established by the Legislature is so obvious and is so clearly founded in the principles of justice and required by the interests of society, it would ill become a Court of equity by narrow and technical constructions to deprive itself of the power to enforce it." *Gough* v. *Pratt*, has been followed in *Emerson* v. *Townsend*, 73 Md. 224; *Huntington* v. *Emery*, 74 Md. 70; *Spies* v. *Rosenstock*, 87 Md. 17; and it seems to me it ought not, after the lapse of nearly fifty years be overruled; when the result of overruling it is to enable the tricky gambler to get from the stakeholder the money which the foolish bettor deposited there, but upon repenting of his folly now seeks, after rescinding his illegal bargain, to get back. If a Court of equity, under these circumstances, has no power by injunction to prevent the bucket shop gambler from drawing the funds belonging to the appellees out of bank and has no process by which those funds can be kept from going into the pocket of the trickster, though the unlawful contract has been repudi-

ated; it is high time that a legislative enactment should explicitly confer such a jurisdiction. I think a Court of equity is clothed with both the power and the process to administer redress and to afford relief in this case; and I am decidedly of opinion that the decree passed by JUDGE BOYD in the Circuit Court was right and that it ought to be affirmed.

(Filed January 13th, 1904.)

A motion for a re-argument was made and in overruling the same.

SCHMUCKER, J., delivered the opinion of the Court.

The appellant has made a motion for a re-argument of this case and has filed a carefully prepared brief in support of his motion. The brief reasserts the arguments advanced in his brief used at the hearing of the case and urgently contends.

*First.* That the money paid on account of the gambling contracts by Deneen to Baxter and by the latter deposited in bank to his own credit must be considered to be the property of Deneen to which Baxter never had any legal or equitable title and the bank must be treated as holding it in the capacity of a stakeholder, and

*Secondly.* That under the authority of the decision in *Gough* v. *Pratt*, 9 Md. 526, Deneen upon repudiating the contracts was entitled not only to sue in a Court of equity to recover back the money which he had paid under the contracts but was also entitled to the active aid of that Court to prevent by injunction the withdrawal by Baxter of the money deposited by him and standing to his unconditional credit in the bank.

This money is clearly not stakes in the ordinary sense of that term, which signifies something deposited by two persons with a third on condition that it is to be delivered to the one who shall become entitled to it by the happening of a specified contingency. Deneen voluntarily paid the money to Baxter with full knowledge of the latter's positive refusal to hold it subject to any condition or any joint control. Although it is

now in the bank it was deposited by Baxter alone and for his own account and was entered to his credit by the bank.   Deneen himself distinctly admitted on cross-examination that he knew that Baxter had the right to withdraw the money from the bank at any time and that he had dealt with Baxter on the faith of the latter's promise that he would not withdraw it and not upon the idea that he had no legal right to withdraw it.

Furthermore when Deneen determined to repudiate his contracts he did not at first claim that this money was his own or that it was held by the bank as a stakeholder and appeal to a Court of equity to compel its return to him ; but, acting advisedly and with the aid of counsel, he, as he informs us in his brief, sued out an attachment from a Court of law against Baxter to recover it from him and laid the writ in the hands of the bank to bind the money as a credit due from it to Baxter.    Copies of the account filed and affidavit made by Deneen in the attachment case appear in the present record and they charge Baxter with the indebtedness *as for money loaned to him by Deneen* a form of pleading entirely inappropriate to the recovery of money knowingly paid or advanced as the stakes of a gambling venture.   The record contains no indication that this attachment suit has ever been dismissed or abandoned.

The evidence shows that the money was in fact paid to Baxter on account of the gambling contracts as margins just as the margins were paid which were involved in the case of *Burt* v. *Meyer*, cited in our opinion now on file in this case, with the additional circumstance that Baxter agreed as part of the contracts in the present case to keep money enough on deposit in Cumberland to make the sheet good or as Deneen in his cross-examination expresses it "The sheet was to be covered at all times, more than enough money left here."

Nor do we think that the case of *Gough* v. *Pratt* when rightly understood furnishes any authority for granting the relief prayed for in the present case.   What was decided in that case was that equity would *prevent the enforcement of a gambling contract* by enjoining the issue of execution on a

judgment which had been recovered on a gambling debt. The case was decided upon the authority of *Thomas* v. *Watson* and the opinion of JUDGE TANEY in that case was inserted in ·full by our reporter as an appendix to *Gough* v. *Pratt.* In *Thomas* v. *Watson* the bill was filed by ·an assignee of the alleged debtor for discovery and for relief by injunction against an execution on a judgment that had been recovered on two notes one of which was alleged on information and belief to have been recovered for a gambling debt and the other for an usurious debt. That also was a case in which equity *extended relief against* the *attempted enforcement* of gambling and usurious debts. Nothing that was required to be decided. in either of those two cases affords any authority for the active interference of equity in aid of the practical enforcement of any of the stipulations of a gambling contract which we have, in our opinion already filed, shown is the relief which the Court is in effect asked to afford in the present case.

In JUDGE TANEY'S opinion in ·*Thomas* v. *Watson*, there appear the *obiter* statements that in a case of usury or gambling, although the party pays his money not only with a knowledge of the facts but with a knowledge of the law also, equity will relieve him and compel the adverse party to refund the money, and that in such cases the money may be recovered back again either by a suit at law or a bill in equity, but an examination of the authorities cited in support of the statements satisfies us that that distinguished jurist could not have· intended by what he there said to assert that the plaintiff in such cases might resort to either law or equity according to his own preference or caprice or that a Court of equity would entertain his suit for the recovery of his money in the absence of facts constituting recognized grounds of equity jurisdiction.

1 *Fonblanques Equity B*, 1 Ch. 4, sec. 7, the authority cited in reference to usurious contracts says that equity will give relief to the borrower *in cases where the law will not reach the lender.* In *Rowden* v. *Shadwell*, Amb. 269, the authority relied on for gambling contracts, the bill was filed for the cancellation of a bond which had been given for money lost at

gaming and to recover back a part payment which had been made on account of the bond. No opinion appears in the report of the case but there were plain grounds of equitable jurisdiction in that case for if the plaintiff had sued at law and recovered the money which he had paid on account, the bond which was an illegal instrument would have remained outstanding against him. In such cases we have recognized as recently as in *Levi* v. *Oppenheimer*, 96 Md. 296, the jurisdiction of equity to grant relief.

Money lost at gaming could not be recovered at common law. The Statute of 9th Anne which is relied on in *Gough* v. *Pratt*, only authorized the recovery of money lost at gaming, *in "an action of debt"* although it required any one liable "to be sued" under the statute to answer a bill of discovery filed in aid of the action of debt for discovering the money or thing lost at gaming. Our own Code, Art. 27, sec. 127, authorizes the recovery of money lost at gaming *"as if it were a common debt."* Certainly nothing in either of these statutes confers jurisdiction on equity to entertain proceedings for the recovery of such debts when unaccompanied by special circumstances which render a Court of law inadequate to grant relief. There is no contention that the bill in the present case was filed for discovery and we have already expressed our views upon the inadequacy of the facts relied on in it as affording special grounds for the equitable relief for which it asks.

The decision in *Gough* v. *Pratt*, has been several times affirmed by this Court but in no case, so far as we are aware has the proposition, that one having lost money at gaming may elect whether to proceed at law or in equity for its recovery, been the subject of approval by us, nor are we aware of any case in which this Court has upheld a Court of equity in giving effect directly or indirectly to the terms of an illegal contract at the suit of a voluntary party to that contract.

The cases of *Morgan* v. *Beaumont*, 121 Mass. 7; *Mount & Wardell* v. *G. & R. Waite*, 7 Johns. 434, and *Vischer* v. *Yates*, 11 Johns. 23, relied on by the appellee in support of his motion were cases *at law* and cannot be regarded as controlling pre-

cedents upon the question of equitable jurisdiction which we have considered in the present case.    The case of *Petillon* v. *Hipple*, 90 Ills. 420, also relied on in support of the motion was a bill in equity "to restrain the enforcement of an unexecuted contract founded on a wager," and it was upon that express ground that the Court assumed jurisdiction of the controversy.    The case is in our judgment entirely consistent with the position assumed by us in the present one.

> *The motion for re-argument will be overruled.*

(Decided March 23rd, 1904.)