EDWARD C. CARRINGTON, JR., Receiver of the
Hammond Ice Company, et al., *vs.* THOMAS
C. BASSHOR CO. et als.

*Trust funds*: *misapplication of funds; liability of parties par-*
*ticipating in—; directors of corporations; "building com-*
*mittee"; technical trustees.   Costs in Court of Appeals.*

All persons who knowingly take part or aid in committing a
breach of trust are responsible for the money so withdrawn
from the trust estate, and they may be compelled to replace
the fund which they have been instrumental in diverting.
p. 429

An Ice Manufacturing Company, about to build a new plant,
appointed certain of its directors as a building committee to
superintend the erection of the plant and disbursement of
the funds.   The bonds of the corporation had been issued,
secured by a first mortgage upon its property; and by an
agreement between the corporation and the bondholders, the
proceeds of the bonds were deposited with a trust company
in the name of the contractor, to be withdrawn by the latter's
check accompanied by a certificate or order of a major-
ity of the building committee, and to be used only for the
purpose of acquiring property and the erection of the new
plant; *Held,* that this deposit was a special deposit and con-
stituted a trust fund, to be used for those specific purposes
only and only to be withdrawn in the way clearly designated.
p. 426

Basshor, one of the directors on the building committee, know-
ingly participated in a wrongful diversion of a part of the
fund, and in its payment to the Basshor Company, of which
he was an officer, for purposes other than those for which
the fund was intended.   *Held,* that such a member of the
committee, and the company which participated in the mis-
application of the fund, were both liable for the amount
so misapplied, and that such sum could be recovered by the

receiver of the company for the benefit of the bondholders; the payment of the sum by either to be a satisfaction of the liability. pp. 431, 438, 443

The corporation that received the benefit of the misapplied funds endeavored to show that by the materials it had furnished and labor it had performed, it had benefited the bondholders; *held* that the burden of proof was upon the company to show by unquestioned evidence that the bondholders had not suffered by reason of such wrongful application of the funds, and it was *further held,* that they had failed in their proof. pp. 427, 443

The legal relationship of the building committee in .this case both as to the Ice Company and as to the bondholders was that of directors and technical trustees. p. 439

As to the building committee, it was *further held* that while they were somewhat careless and negligent in many respects, none of them but Basshor were guilty of such gross and culpable negligence as to make them personally liable. p. 442

There being 20 appeals in one record and some appeals being affirmed and some reversed, *it was* held as to the costs of the case in the Court of Appeals, that one-third of the costs should be paid by the Basshor Co. and others who had participated in the wrongful conversion of the funds and two-thirds of the cost should be paid by the receiver of the Ice Company. p. 444

In the exercise of their powers, directors will not be subject to personal responsibility, unless the imprudence is so clear and manifest as to amount to *crass* negligence. p. 439

Directors, managers and technical trustees are liable for negligence and reckless conduct. p. 439

Directors are not liable for the consequences of unwise or indiscrete management if their conduct is entirely due to mere default or mistake of judgment; and the *onus* of proving fraud, combination or gross negligence, to render the directors personally liable, is upon the party making the charge, and the proof must be clear and manifest. p. 439

There is a distinction between the measure and standard of liability of directors and of technical trustees; trustees not being personally liable unless there has been both negligence and resulting loss.                                    p. 440

Directors of a financial enterprise can not be held liable collectively for the acts of the board, but each may be liable for his own acts, whether of omission or commission, and the respective liability of different members of the board may be entirely different.                            pp. 440, 441

*Decided July 13th, 1912.*

Twenty appeals in one record from Circuit Court No. 2 of Baltimore City (STUMP, J.).

The facts are stated in the opinion of the Court.

The twenty appeals were argued together before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Wm. Ewin Bonn* and *Edwin J. Baetjer,* for the appellant.

*Wm. Colton, W. Calvin Chesnut, Edgar Allan Poe* and *Vernon Cook,* for the appellees.

BRISCOE, J., delivered the opinion of the Court.

The voluminous record now before us brings to this Court for review twenty appeals, taken by the plaintiffs below, from decrees of Circuit Court No. 2 of Baltimore City, dated the fifth day of December, 1911, dismissing certain bills of complaint which had been filed by the plaintiffs against different groups of defendants in that Court, after a hearing, and upon answers and full proof, filed in the cases.

The litigation grows out of the insolvency of the Hammond Ice Company, a corporation, under the laws of Dela-

ware, with its principal place of business in the City of Balti·
more.

The object of the suits was for the purpose of holding the
several defendants liable for the diversion and misappropria-
tion of a "special fund" which had been dedicated and
devoted by the terms of the mortgage, and certain agreements,
to the erection of Plant No. 2 of the Hammond Ice Com-
pany, and to recover this fund for the benefit of the bond-
holders and the creditors of the company.

The cases were before us, on demurrer, on a former
appeal, *Basshor Company et al.* v. *Carrington et als.*, reported
in 104 Md. 606, where it was held that the fund here in con-
troversy was impressed with a trust and that a Court of
Equity had jurisdiction to entertain these suits for the recov-
ery of claims of this kind. The demurrers were overruled
and the cases were remanded in order that the defendants
might answer the bills.

The legal principles applicable to the cases were clearly
stated and announced in a carefully prepared opinion on the
former appeal, and it now remains for us to inquire whether
the proof supports the allegations of the several bills and
brings these cases within the settled principles of law as
there stated.

While the record presents twenty appeals taken from ten
separate decrees or orders of the Court below, it will be
seen that they practically present but four separate and dif-
ferent controversies, and for convenience will be designated
by us as (1) *The Basshor Case;* (2) *The Sheridan Case;*
(3) *The De La Vergne Case,* and (4) *The Hammond Cases.*

The averments and allegations of the several bills are sub-
stantially the same, and as they are fully set out in the opin-
ion on the former appeal, it will not be necessary to repeat
them here, except to say that it is alleged by the first bill
that moneys were improperly paid to the Thomas C. Basshor
Company by Hammond upon the authority and order of the
other defendants in that case; in the second bill that moneys
were wrongfully paid to the De La Vergne Refrigerating

Machine Company, by Hammond on the order of the other defendants; in the third, that they were so paid to John A. Sheridan by Hammond on the order of the other defendants and in the fourth that they were so paid to Hammond himself on the order of those defendants.

It also appears that Ormond Hammond, at the time, was a contractor for the building of the ice plant to be known as Plant No. 2, of the Hammond Company, and Messrs. Westcott, Martin, Evans, Basshor and Dallam constituted the Building Committee of the company.

On the tenth of November, 1902, a loan of $300,000 on the bonds of the company and the subscription contracts was secured through the City Trust and Banking Company, as shown by Exhibits E. & F., and by agreement, the amount of this loan was to be deposited with the Trust Company, and to be withdrawn upon checks signed by Ormond Hammond, accompanied by certificates or orders of the Building Committee, and to be used on account of the purchase and acquisition of the property, real, personal and mixed, and the erection of the plant, known as Plant No. 2 in Baltimore City and the storage houses and other property and effects incident thereto, as described in Exhibit A., filed in the case. And it is a portion of this special fund that is alleged to have been improperly diverted and wrongfully misapplied by the several defendants in this record, and for the recovery of which these suits were instituted.

This brings us to a consideration of the several cases as presented by the record. We shall dispose of them separately, and state as concisely as possible the reasons for the conclusions we have reached, after a careful examination of the record, and the very full briefs of the counsel who argued the cases.

The *Basshor case* involves a claim of $21,000 paid the Thos. C. Basshor Company on the 20th day of November, 1902, by Ormond Hammond in settlement of account due for work done on Plant No. 1, and which sum it is alleged

was paid from funds derived from the special fund devoted to Plant No. 2.

The proof shows that on the 19th day of November, 1902, Messrs Martin, Evans, Dallam and C. Hazeltine Basshor, members of the Building Committee, drew the following order payable to Ormond Hammond.

BALTIMORE, Nov. 19th, 1902.
*The City Trust and Banking Company, Baltimore, Md.*

Pay to Ormond Hammond or order twenty-one thousand dollars in cash, and charge same as payment to Mr. Hammond on contract for Plant No. 2, account workmanship and material, as per agreement with Thomas C. Basshor & Co.

(Signed)

PATRICK MARTIN,
C. H. BASSHOR,
W. H. EVANS,
FREDERICK DALLAM,
*Building Committee of the Hammond Ice Company.*

On the 20th of Nov., 1902, Mr. Hammond drew a check as follows:

Special A. C.

No. 28.

BALTIMORE, MD., Nov. 20, 1902.
*City Trust and Banking Company.*

Pay to the order of Thomas C. Basshor Co. $21,000.00— twenty-one thousand—00/100 dollars.

(Signed)                    O. HAMMOND.

This check is endorsed, Pay to order of Commercial and Farmers National Bank, Thomas C. Basshor Co.  Commercial and Farmers National Bank, Baltimore, Md., and was paid Nov. 20, 1902.

The books of the Basshor Company show that on the date when this order and check were given, there was due from the Hammond Ice Company to the Basshor Company the sum of $21,000 for work done on Plant No. 1, and this precise sum appears to have been paid and applied on the books

of the Basshor Company as a settlement in full of the debt
due and owing on Plant No. 1.

The books of the company were balanced by the payment
of this sum, and the account against Plant No. 1 was closed.

The lot upon which Plant No. 2 was to be erected was not
purchased until December 9th, 1902, and the ordinance per-
mitting the erection of the plant was not passed until Decem-
ber 16th, 1902. The work of constructing the plant did not
actually begin until January 1st, 1903.

It was provided by an agreement between the Hammond
Ice Company and Ormond Hammond (Exhibt A.), that the
parties hereto covenant and agree, that the total issue of
said bonds, that is to say, $1,400,000, or the cash which may
result from the sale thereof, with $2,800,000 of full paid
capital stock of the party of the second part, shall be the
consideration for the purchase, acquisition, erection and
transfer to the party of the second part of the property above
specified, which bonds (or the money resulting from the sale
thereof), or the money which may be obtained through any
loan secured by the bonds or any interest therein and the
stock above mentioned, shall be delivered to the party of the
first part in installments from time to time as *the work on
the plant progresses, upon orders or certificates* of said *Build-
ing Committee* until the completion and acceptance of said
plant, when all the balance of said bonds (or cash from the
sale thereof) and stock shall be delivered to said party of
the first part, less however the sum of $125,000 working
capital above referred to.

And it was further provided by Exhibit E that the amount
of the loan to the "Borrower" after the deduction of the
interest and commission hereinbefore provided, shall be
placed to the credit of the "Borrower," with the "Trust Com-
pany," to be withdrawn upon checks executed by him accom-
panied by certificates or orders of the Building Committee,
and to be used on account of the purchase and acquisition of
the property, real, personal and mixed and the erection of
the plant, known as Plant No. 2 in Baltimore City and the

storage houses and other property and effects incident there-
'to, which are particularly described in the said exhibit here-
to attached, as Exhibt "A."

In *Basshor Co.* v.. *Carrington,* 104 Md., *supra,* we said,
"that this deposit must be treated as a trust fund, that it was
a special deposit to be used for specific purposes and could
only be withdrawn in a way clearly designated. The Ham-
mond Company had covenanted with the trustee and the
bondholders that the proceeds of the bonds should be used
for the purposes named in the mortgage and "none other"
and in order to protect the company and the bondholders the
agreements are entered into."

C. H. Basshor was Vice-President and General Manager
of the Thomas C. Basshor Company and also a member of
the Building Committee, and it cannot be held, under the
facts and circumstances of this case that he was not aware
of the misapplication of this fund, because he not only had
knowledge of the purposes for which the fund had been
deposited, but actually participated in the diversion by
receiving the money.

The witness Sheridan testified that C. H.. Basshor told
him that Hammond had paid him the amount due him on
Plant No. 1, and we think it is clear, from the whole proof
that the check of Hammond to the Basshor Company dated
November 20th, 1902, for $21,000 of the trust fund, was
applied to pay and satisfy the indebtedness due on Plant
No. 1, and was not applied in connection with the construc-
tion and equipment of Plant No. 2, the purpose for which
the fund had been specially devoted.

The Court below in its opinion concedes that the $21,000
paid the Basshor Company was credited on Plant No. 1, and
says, "it seems that some of the persons for whose benefit
these orders were given gave credit to the account of Plant
No. 1, for instance, the Basshor Company's account; at any
rate that money was practically credited on Plant No. 1
to balance that account on the books of the company."

But it is contended that the Basshor Company under contract with Hammond delivered a large amount of valuable material under contract for Plant No. 2, and the Company also prepared certain other material, piping, etc., which was to enter into the construction of Plant No. 2, and it is claimed that the bondholders received the benefit of these, in the sale of Plant No. 2 by the receivers.

The testimony upon this branch of the case is very far from satisfactory, and does not, we think, sustain this contention. The burden of proof was on the Basshor Company to show by unquestioned evidence that the bondholders did not suffer by reason of the wrongful application of the $21,000, and this we think they have failed to do.

The testimony shows that when the work stopped on Plant No. 2, in June, 1903, that the materials that had been delivered and not incorporated in the plant, were taken away by the parties who had furnished them.

The Witness Butler, the consulting engineer, testified:

"121 Q. The only thing the Basshor Company put in place, that you can recollect, are the condensing pans, aren't they?

A. That was the only thing that was completed, as to the contract with the Basshor Company, except the delivery of the pipe cutters, and things like that, which were used in the pipe work.

122 Q. The other work of the Basshor Company could not have been put in place until some preceding work was done; isn't that so?

A. That is right.

68 Q. You spoke, Colonel, of various things being delivered to the plant not being put in place; do you know what became of those things?

A. The parties that furnished them. I suppose, got them, as I understand.

69 Q. Took them away again?

A. Took them away again, yes, sir."

The witness Jones testified:

"72 x-Q. What were your duties there after the work stopped?

A. Well, I was awaiting orders, looking after the material that was there.

73 x-Q. Do you recollect what was done with the material that was delivered by these various people down on Block street; do you remember when they took it away?

A. I know it was taken away; I do not know when.

75 x-Q. Do you remember Mr. Basshor taking some of his away?

A. Well, everybody took theirs away. I do not know—all that could get it took it away."

The witnesses Giest, Westcott, Evans and Carrington testified to the same effect; Mr. Carrington stated that the material on the ground was removed by the parties before the appointment of receivers and Mr. Evans testified that the machines and material were removed and not sold by the receivers.

Besides this, the books of the Basshor Company do not show any charges for any of the work done or material claimed and alleged to have been done under contract for Plant No. 2.

Manifestly the bondholders got no benefit from the work claimed to have been done in the shops, or for materials delivered and not put in the plant, and afterwards removed by the parties, and not sold by the receivers.

It is conceded that the condenser pans were furnished by the Basshor Company and put upon Plant No. 2. According to the testimony of Mr. Ziers, an expert manufacturer of ice machinery, these would be worth about four thousand dollars. This amount, according to Mr. Basshor's testimony, must have been settled by the subscription to twelve bonds of Plant No. 2 for which the Basshor Company had paid nothing.

"327 Q. Mr. Basshor, did you subscribe to any bonds on Plant No. 2 of the Hammond Ice Company?

A. I did.

328 Q. You or your company?

A. I did for the company, I think.

329 Q. Were bonds taken?

A. Never received, but I always considered them paid for by material furnished.

330 Q. How large was the amount of those bonds?

A. Twelve bonds at eighty."

It seems then from the whole proof, that the payment of this check to the Basshor Company and the application of its proceeds to Plant No. 1, under the facts and circumstances of this case, was a manifest diversion of the fund from the purposes to which it was devoted and the plaintiffs are entitled to recover it in this suit for the benefit of the bondholders.

In *Safe Deposit Company* v. *Cahn,* 102 Md. 535, it is distinctly said: it is a general principle that all persons who knowingly take part or aid in committing a breach of trust are responsible for the money thus withdrawn from the trust estate and they may be compelled to replace the fund which they have been instrumental in diverting. *Duckett* v. *Mechanics Bank,* 86 Md. 403; *Basshor Co.* v. *Carrington,* 104 Md. 630.

(2) The Sheridan claim, we think, is free from difficulty and rests somewhat upon similar principles of law, as were applicable to the *Basshor case.*

It appears that on the 19th of November, 1902, Messrs. Martin, Basshor, Evans and Dallam, members of the Building Committee gave Mr. Hammond an order on the City Trust and Banking Company for $5,100 out of the special fund, and "to charge same as payment to Mr. Hammond on contract for Plant No. 2, account workmanship and materials as per agreement with John A. Sheridan." On November 21st, 1902, O. Hammond drew a check marked special account payable to John A. Sheridan for the identical sum of $5,100, and this check was delivered and paid to Sheridan. There was due by Hammond to Sheridan at this date, for work done in the erection of ice storage warehouses

for Plant No. 1, the sum of $5,000 and Sheridan held Hammond's note for this sum. This note with interest amounted to the sum of $5,100 and was paid on the 21st of November, 1902, by the check of Hammond on the special fund, and the note was returned to Hammond.

Mr. Sheridan testified that the check for $5,100 was given him by Hammond to pay the note he had given him for the amount that he owed on the ice storage warehouses, and that it had no relation to any work that he did on Plant No. 2 of the Hammond Ice Company. He further testified that the contract for the building of Plant No. 2 had not been award-ed him on November 21st, when the check was received by him.

Mr. Hammond testified as follows:

"79 Q. And it was your understanding that Mr. John A. Sheridan when you gave him this check for $5,100.00 that he was to take it and take up the note for $5,100.00 which we have been referring to, wasn't it?

A. It was at his request that I paid him enough on account to enable him to take up the note.

80 Q. And you gave him the check for that purpose

A. I gave him a check for $5,100.00 on account for construction of Plant No. 2 and took his receipt to that effect.

81 Q. And the $5,100.00 was the exact amount that you owed him on Plant No. 1?

A. It was the amount of the note with interest attached.

82 Q. And Mr. Sheridan took the check and took up the note, didn't he?

A. I do not know exactly how he took it up. He returned the note to me."

According to the testimony of a number of the witnesses no work had been done upon Plant No. 2 when this money was paid Sheridan and it could not have been paid for work done on Plant No. 2 because the contract for the construction of the building, according to Sheridan's testimony was not awarded him until the 20th of December, 1902, and no act-ual work was done on Plant No. 2 until January 3rd, 1903.

But apart from this both Hammond and Sheridan were advised that it was improper to pay Hammond's note, with money belonging to a special fund, but with full notice and knowledge of the purposes for which the special fund had been deposited and devoted, they applied the proceeds of the check to pay an indebtedness for work done on Plant No. 1, thereby diverting the fund from its proper purpose, to wit, the construction of Plant No. 2.

It is difficult to see under the facts and the proof, disclosed by the record in this case, how the defendant Sheridan can escape liability to the plaintiffs for the money thus wrongfully withdrawn from the special or trust fund, and under the principles of law heretofore announced in this case, the plaintiffs are clearly entitled to recover the amount, so diverted, for the benefit of the bondholders.

(3) The *De La Vergne case* involves a check for $30,000, and the facts are as follows: On the 8th of November, 1902, Messrs. Dallam, Martin and Westcott of the building committee drew an order on the City Trust and Banking Company, authorizing it to honor O. Hammond's checks to the De La Vergne Refrigerating Machine Company for thirty thousand dollars as part payment for engines now being constructed for Plant No. 2, of the Hammond Ice Company, as per the company's agreement with Mr. O. Hammond, of August 28th, 1902.

It appears from the record that on the 8th of November, 1902, O. Hammond owed the De La Vergne Company a balance for work done on Plant No. 1, and for which he had given his notes. The amount due at this date with interest was $20,413.00.

There is some conflict in the evidence as to the date when the contract for the installation of the machines on Plant No. 2 was entered into by the parties, but the following agreement bears upon and fixes the date as to the payment of the money.

NEW YORK, November 11, 1902.

WHEREAS, Ormond Hammond, of the City of Baltimore, is indebted to The De La Vergne Refrigerating Machine Company to the extent of nineteen thousand eight hundred and twenty-six and 63-100 dollars, represented by three promissory notes, as follows:

One for $7,500, dated May 15th, 1902, due Sept. 15, 1902, with interest;

One for $7,500, dated May 15th, 1902, due Nov. 17, 1902, with interest;

One for $4,826.63, dated August 2d, 1902, due Dec. 2, 1902, with interest; and,

WHEREAS, The said Hammond and said The De La Vergne Refrigerating Machine Company have entered into a contract bearing date the 28th day of August, 1902, whereby the said company is to construct and deliver to the said Hammond certain ice-making machines for the sum of ninety thousand dollars ($90,000); and,

WHEREAS, Under the provisions of said contract, the first payment thereunder, to wit, thirty thousand dollars ($30,000) is to be made in cash within sixty days from the date of said contract;

*Now, This Indenture Witnesseth,* That in case the said payment of thirty thousand dollars ($30,000) is made on or before the 15th day of November, 1902, then and in that event the said company will take up the said notes as they shall severally mature and hold the said Hammond harmless therefrom; and in case the balance of the purchase price of ninety thousand dollars ($90,000) is fully paid according to the terms of said contract, the company will then pay to the said Hammond in cash the difference between the amount which shall be due upon said notes at maturity and the sum of twenty-five thousand dollars ($25,000).

*In Witness Whereof* the parties hereto have hereunto set their hands and seals this 12th day of November, 1902.

(Seal) THE DE LA VERGNE REFRIGERATING MACHINE CO.

(Seal) ADOLF BENDER, General Manager.

(Seal) ORMOND HAMMOND.

On the 12th of November, 1902, Hammond sent a check to the De La Vergne Company for $30,000 and the following correspondence shows beyond any doubt that $20,413.30 of the special fund was applied to the payment of the notes which had been given for work done on Plant No. 1, and was not used for the construction of Plant No. 2.

BALTIMORE, Nov. 12, 1902.

*Adolf Bender, Esq.,*
*Gen. Mgr. De La Vergne Machine Co., New York.*

MY DEAR SIR: Enclosed you will please find copy of the agreement signed by me as you request, also check according to agreement for $30,000 on account, upon receipt of which you will please mail me a receipt showing the contract price, viz: $90,000, with a credit of $30,000, so that I can keep these receipts on file for the examination of my Building Committee. You will also oblige me very much by taking up the three notes at that end, as I do not wish them presented here for important reasons, which I am sure you will appreciate. Kindly return to me the notes when you take them up and also the stock that I gave you as collateral security.

Trusting everything will be satisfactory to you and expecting to hear from you by, return mail, I remain,

Yours truly,

O. HAMMOND (Sgnd.)

P. S.—Please send me also a receipt for the little additional bills that you have mailed lately, and for which I want the enclosed check to cover.

NEW YORK, November 13, 1902.

*O. Hammond, Esq.,*
*403 Maryland Trust Building,*
*Baltimore, Md.*

DEAR SIR: We received your telegram of yesterday, also your valued favor of the 12th enclosing check for $30,000 as agreed.

We enclose herewith a receipt for this amount and also a statement showing the total balance on the notes including interest up to today, and the open account of $51.49 of $20,413.30.

In this connection we beg to suggest that you send us your check for $413.30, thus wiping out the old account completely and crediting an even $10,000 on the new deal.

We note what you say concerning taking up the notes at this end and we have arranged to do this. As they come due we will pay them here and mail the notes to you.

THE DE LA VERGNE REFRIGERATING MACHINE CO.,

ADOLPH BENDER, General Manager.

The witness Baron, the secretary and treasurer of the De La Vergne Company, produced the company's general ledger and testified as follows: "Q. You said Mr. Baron that this account on page 761 of this ledger showed the payment in full of those notes? A. Yes, sir. Q. That there was credited paid as of Nov. 15, 1902, $20,000, and Nov. 14, 1902, cash $413.30, and that paid in full the contract for Plant No. 1? A. Yes, sir."

The testimony is entirely too conflicting and unsatisfactory to sustain the contention that this company installed any machines into the construction of the plant from which the bondholders derived any benefit.

The testimony rather shows that this company after the failure of the Ice Company was allowed to remove a large part of the machinery it had delivered.

The witness Evans testified as follows:

"Q. You say the De La Vergne Company delivered some machinery to Plant No. 2?

A. Yes, sir.

Q. What became of those machines?

A. I think some of them were allowed to remove them as did a number of other contractors after the failure.

Q. You are certain they were taken away?

A. Certain they were taken away; they are not there now.

Q. And you are certain you did not sell them as receiver?

A. I think not."

The witnesses Westcott, Jervis and Carrington testified to the same effect, the latter stating that the De La Vergne

Company sent part of the engines in crates and took them back again.

We do not see any ground upon which the defense relied upon on this branch of the case can be based or be sustained. The application of the special fund to the payment of the old indebtedness due on Plant No. 1 was not only unauthorized, but it was an improper and a wrongful diversion of the fund.

It appears from the record that the De La Vergne Company is a foreign corporation and no process appears to have been served upon it. There was apparently no appearance for them in the Court below, and it was not represented by counsel in this Court.

We have discussed the transaction with this company because of its supposed bearing upon the liability of the building committee.

(4) The Hammond cases involve nine checks of ten thousand dollars each, and as they differ but slightly on the main facts they will be considered together. The averments of the bills, as we have said, are substantially the same and they charge that on the date named in them, Ormond Hammond drew checks upon the special fund to the order of himself for the sum of ten thousand dollars each, and the defendants, the building committee (naming them), executed and delivered contemporaneously with the checks an order and certificate directing the payment thereof out of said special account, and the amount of each check was thereupon actually paid to Hammond. It is further averred that the checks were not given and the money was not paid or payable for the construction and equipment of Plant No. 2, or for the acquisition of any property therefor, or for the payment of any expenses or indebtedness in connection with construction, equipment or acquisition; that at that time no progress had been made in acquiring property and constructing the plant, and Ormond Hammond was not entitled to any payment under the contract marked Exhibit A therefor, nor were the checks or money given for any of the purposes to which by the terms of the mortgage and contracts the fund or money

on deposit in said special account was to be devoted, nor was it used for such purposes, but was wholly diverted therefrom.

And it is further charged that each of said defendants had full notice and knowledge of the purposes for which the fund was deposited and to which it was devoted, and of said mortgage and agreements; that the defendant Ormond Hammond knew that he was not entitled to any payment out of said fund, and that the payment of said checks were a diversion thereof.

It is perfectly clear, we think, from the proof that two of the checks, to wit, checks dated Nov. 19th and Dec. 17, 1902, respectively, for ten thousand dollars each, were given before the "work on the plant" had actually begun, and that part of the $90,000, embraced in the nine checks paid Hammond did not go into the work of construction of Plant No. 2, but was actually diverted and misapplied by him.

The book kept by Hammond of his payments and the application of the money or checks was filed with the testimony by the defendants as Exhibit H. No. 5, and an examination of this account in connection with the evidence in the case plainly shows a number of payments made on account of Plant No. 1, and other payments not properly chargeable to Plant No. 2.

The items in this account book cover over twenty pages of the record, and we shall state the principles upon which an account can be stated, when the case is remanded charging Hammond with all monies received on account of Plant No. 2, and crediting him with all sums that were properly expended in the construction of that plant.

Plant No. 2 was to cost about $700,000.00 and was to have a capacity of six hundred tons of ice per day. While the evidence is somewhat conflicting as to how far the work had progressed it is certain that large sums of money had been expended when the work on the plant stopped.

The plant sold in November, 1904, for the sum of $120,-000 and after deducting certain liens and expenses, there was $67,936.14 to be distributed to the bondholders and creditors.

After the payment of the dividends the amount due bond-holders and creditors appears to amount to about $400,000.

A statement of what work was done in the construction of Plant No. 2 was made after the work had stopped and this statement shows the immovable improvements at that date. It is as follows:

PLANT No. 2.

*Immovable Improvements.*

| | |
|---|---:|
| Land................................. | $82,000.00 |
| Building.............................. | 58,000.00 |
| Artesian Wells........................ | 5,037.02 |
| Engine Foundations.................... | 16,400.00 |
| Boiler and Stack Foundations........... | 2,208.05 |
| Smoke Stacks......................... | 6,329.00 |
| Wharf Improvements................... | 15,238.79 |
| Condenser Pan....................... | 6,000.00 |
| Cap Stones........................... | 3,471.85 |
| Tank Foundations..................... | 15,000.00 |

$209,684.71

It appears, however, that only $40,000 had been paid on the land and deducting this amount from the $82,000 charged for the land would leave the value of the land and improvements at the time the work was stopped at about $168,000.

It is conceded that Hammond drew checks against the special fund amounting to $218,610, and we have held that the three checks, one to Thomas C. Basshor Co. for $21,000, one to De La Vergne Co. for $20,413, and the other to John A. Sheridan for $5,100, were wrongful diversions of this fund. It seems equally clear from the proof that the $10,000 paid Hammond on the 19th of November, 1902, and the $10,000 paid him on the 17th of December, 1902, were largely used for purposes other than Plant No. 2.

It appears from the record that from November 12th, 1902, to May 4th, 1903, the sum of $146,100 were paid out of the special fund upon the following checks, viz.:

1. Nov. 12, 1902—De La Vergne R. M. Co...... $30,000
2. Nov. 19, 1902—Ormond Hammond............ 10,000
3. Nov. 20, 1902—Thomas C. Basshor Co........ 21,000
4. Nov. 21, 1902—John A. Sheridan............. 5,100
5. Dec. 17, 1902—Ormond Hammond............. 10,000
6. Jan. 21, 1903—Ormond Hammond............. 10,000
.7. Feb. 17, 1903—Ormond Hammond............. 10,000
8. Feb. 20, 1903—Ormond Hammond............. 10,000
9. Mar. 17, 1903—Ormond Hammond............. 10,000
10. Mar. 30, 1903—Ormond Hammond............. 10,000
11. Apr. 16, 1903—Ormond Hammond............. 10,000
12. May  4, 1903—Ormond Hammond............. 10,000

The same principles of law applicable to the other cases and cited herein, will control in the accounting between Hammond as contractor and the special fund here in controversy. He will be charged with the money paid him on account of Plant No. 2, and of course will be credited with such sums as were properly paid and applied on account of the construction of Plant No. 2.

The funds that were paid on account of the old indebtedness due on Plant No. 1, and those expended by Hammond for his personal benefit and not applied to Plant No. 2, can be recovered by the plaintiffs for the benefit of the bondholders under the principles of law cited herein.

There is, to state it plainly, a degree of uncertainty attending many of the credits claimed by Hammond as payments on account of the construction of Plant No. 2 which cannot be overlooked by us, and an examination of the record fails to convince us that there is sufficient evidence to entitle them to be allowed. He was a man of small means, largely involved financially by reason of the construction of Plant No. 1, and other circumstances, and under the proof but little credit can be given to the statement filed by him in these cases Exhibit Hammond No. 5, unless supported by other evidence.

The decrees in the cases against Hammond will, therefore, be reversed, the cases remanded, with direction that they

be referred to the auditor to state an account between the parties as herein indicated.

This brings us to a consideration of the negligence and liability of the several members of the building committee, under the allegations of the several bills filed herein. As all the bills allege that the members of the building committee who signed the various orders or certificates had knowledge of the purposes for which the fund of $300,000 was devoted, and "either knew that said checks were not given for any of the purposes to which the fund was devoted or made no inquiry and recklessly and negligently executed and delivered the certificates," we shall dispose of the several contentions together.

Without re-stating the facts, it is sufficient to say that the legal relationship of the building committee in this case to both the Ice Company and bondholders was that of directors and technical trustees. They were all directors of the Hammond Ice Company and had been appointed a committee of directors to have charge of the construction of Plant No. 2. They were all subscribers to the bonds and Messrs. Evans, Martin and Westcott had subscribed and paid for $34,000 of the bonds. Every one of the orders or certificates signed by the building committee shows on its face the way the money was to be applied by Hammond, and it was to be paid on account of work for Plant No. 2.

The law is well settled in this State and elsewhere as to the liability of directors, managers and technical trustees, for negligence and reckless conduct, as is sought here to be enforced against this committee.

In *Booth* v. *Robinson,* 55 Md. 419, JUDGE ALVEY said in quoting from *Overend* v. *Gurney,* L. R. 4 Ch. 701, "that facts which may show imprudence in the exercise of powers clearly conferred upon directors will not subject them to personal responsibility; but if the imprudence be so great and manifest as to amount to *crassa negligentia,* and consequently a breach of trust, personal responsibility will be incurred. Indeed all the cases agree that directors are not

liable for the consequences of unwise or indiscreet management, if their conduct is entirely due to mere default or mistakes of judgment. And the onus of proof of fraud, combination or gross negligence, to render the directors personally liable, is upon the party making the charge; and the proof must be clear and manifest."

In *Reus Loan Co.* v. *Conrad,* 101 Md. 229, JUDGE JONES adopts the language as used in 10 *Cyc.* 830, as a result of the authorities, to the following effect, "none of the decisions exact more than a reasonable business knowledge and skill, strict good faith and a reasonable measure of care and diligence under the circumstaances of the particular case." And to the same effect are the cases of *Emerson* v. *Gaither,* 103 Md. 564; *Fisher* v. *Parr,* 92 Md. 245; *Murphy* v. *Penniman,* 105 Md. 452; *Foutz* v. *Miller,* 112 Md. 461; *Briggs* v. *Spaulding,* 141 U. S. 132.

While there is a distinction between the measure and standard of liability of directors and of technical trustees, the authorities hold that trustees are not personally liable unless there has been both negligence and resulting loss.

In *Diffenderffer* v. *Winder,* 3 G. & J. 341, it was held where trustees act *bona fide* and with due diligence they have always received the favor and protection of Courts of Equity, their acts have been regarded with the most indulgent consideration. But on the other hand where they have betrayed their trust, where they have "grossly violated their duty; where they have been guilty of unreasonable negligence, they forfeit all claims to the favor and protection of the Court." *Chase* v. *Lockerman,* 11 G. & J. 208; *Gray* v. *Lynch,* 8 Gill, 432; *Maennel* v. *Murdock,* 13 Md. 164; *McCoy* v. *Horwitz,* 62 Md. 183; 28 *A. & E. Enc. L.* (2nd Ed.), 1059; 31 *Cyc.* 1469.

It is a familiar rule of law, in this State that directors of a financial enterprise can not be held liable collectively for the acts of the board, but each may be liable for his own acts, whether of omission or commission, and, therefore, the

respective liability of different members of the enterprise
may be entirely different.

No one can read the record now before us without being
satisfied and coming to the conclusion that the failure of the
enterprise or loss to the bondholders was not due to the
gross negligence or culpable neglect of the building com-
mittee, except as hereinafter stated.

The project for Plant No. 2 was a large one and an issue
of $1,400,000 of bonds had been underwritten by parties
who were supposed to be responsible.

The direct cause of loss to the company and the collapse
of the enterprise as shown by the proof was in consequence
of the failure of the City Trust and Banking Company and
the failure of the subscribers to take and pay for the bonds.

We do not think that the allegations of the plaintiff's bill
(in each case) are sustained by the evidence to the effect
that the committee (except C. H. Basshor in the Thomas C.
Basshor Company certificate), at the time of the issue of the
certificates to Hammond, either knew that the checks were
not given for any of the purposes to which the fund was
devoted, and recklessly and negligently executed and deliv-
ered the certificates.

On the contrary, as we have said, every one of the orders
signed by the Building Committee expressly shows on its
face that it was drawn on account of work for Plant No. 2.

The committee had every confidence in Hammond, the
President of the company and the General Contractor for the
erection of Plant No. 2, and had reason to believe that the
money was being properly paid out on Plant No. 2, as di-
rected by the certificates.

As was said by this Court in *Foutz* v. *Miller, supra,*
"when the acts of the parties are considered in the light of
the situation and conditions in which they were placed while
it may be said they were unwise, indiscreet and inefficient in
the management of the association and were guilty of some
negligence, we do not find that they were guilty of such

gross or culpable negligence, which must clearly be shown before they can be held to be personally liable."

In the case of C. Hazeltine Basshor however who not only signed the certificate to O. Hammond but subsequently actually participated in the diversion by applying the check to the payment of the ·old indebtedness due on Plant No. 1, to his company, the facts are different and we are compelled to hold upon the evidence in the case both upon principle and authority, that he committed a breach of trust in applying the funds to Plant No. 1 and is clearly liable, in this suit.

Nor can we hold, under a proper and reasonable construction of the agreements filed in the case, that the certificates or orders given Hammond by the building committee before the work on the plant actually began, were such a diversion of the special fund under the facts and circumstances of this case, as to constitute gross or culpable negligence and wilful neglect on the part of the Building Committee as to make them liable except as herein indicated.

While it is true that the agreement Exhibit A recites that the bonds or proceeds thereof should be delivered to Hammond in instalments from time to time as the work on the plant progressed under orders or certificates of the Building Committee, yet as we have held whenever the payments were properly applied to Plant No. 2 the defendants would be exempt from liability because the bondholders got the benefit of these payments in the progress of the work, and no loss resulted therefrom. Whenever the fund was diverted or misapplied to Plant No. 1, or to purposes other than Plant No. 2,· it has. been held that the parties who knowingly participated· in the breach, were liable for the diversion.

So without extending this opinion to an unreasonable length it may be said as a result of a very patient examination of the lengthy record in the case, that while we find that the Building Committee were somewhat careless and negligent in many respects, we are unable to hold except in the case of C. H. Basshor, that they were guilty of such gross

and culpable negligence as would justify a Court in finding them personally liable. The burden of proof was upon the party making the charge and according to all the authorities the evidence must be both clear and certain. We are not satisfied that the plaintiffs have met the burden of proof in this case as required, and the evidence tending to show liability on the part of all of the committee is both unsatisfactory and conflicting.

It would be exceedingly dangerous and against the well established rules of law in such cases to hold Messrs. Westcott, Martin, Evans and Dallam, members of this committee, personally liable for the diversion of this special fund on the evidence now before us, and as urged by the plaintiffs in their oral arguments at bar and in their briefs.

In *Gray* v. *Lynch,* 8 Gill, 403, this Court said, "to compel trustees to make up a deficiency not owing to their wilful default is the harshest demand that can be made in a Court of equity."

Of course we would not be understood as holding the Thomas C. Basshor Company and C. Hazeltine Basshor as both liable for the payment of the $21,000.00. The payment by either will be a satisfaction of the liability.

We have examined the rulings upon the exceptions to the testimony and find no such error as would affect the conclusions reached by us, so they will not be discussed.

It results from the conclusions we have reached that the decree appealed from in Appeal No. 1 will be affirmed as to Messrs. Evans, Martin and Dallam, and reversed as to the Thomas C. Basshor Company, C. Hazeltine Basshor and Ormond Hammond, and the case remanded that further proceedings may be had as indicated in the foregoing opinion.

That the decree appealed from in Appeal No. 2 be reversed in so far as it relates to or affects Ormond Hammond, and affirmed as to the other defendants affected by it, and that the cause be remanded for further proceedings.

That the decree appealed from in Appeal No. 3 be affirmed as to Messrs. Martin, Evans and Dallam, and that as to the

defendant, Ormond Hammond that the cause be remanded without either affirming or reversing said decree for the further action of the Circuit Court No. 2 in accordance with the opinion this day filed.

That the decrees appealed from in Appeal No. 4, No. 5, No. 6, No. 7, No. 8 and No. 9 be affirmed as far as the said decree relates to or affects Messrs. Westcott, Basshor, Martin, Dallam and Evans, and that as to the defendant, Ormond Hammond in each of said appeals that the cause be remanded without either affirming or reversing said decrees, for the further action of the Circuit Court No. 2 in accordance with the opinion this day filed.

That the decree appealed from in Appeal No. 10 be affirmed as far as the same relates to or affects Messrs. Martin, Basshor, Evans and Dallam, and reversed as to the defendant John A. Sheridan, and that the said cause be remanded to the said Circuit Court No. 2 without affirming or reversing the said decree as to the said Ormond Hammond, that further proceedings may be there had in accordance with an opinion this day filed.

We further hold, that one-third of the costs in this Court be paid by the said Thomas C. Basshor Company, John A. Sheridan and Ormond Hammond, and two-thirds of the costs in this Court be paid by the receiver of the Hammond Ice Company out of the funds in his hands; and that the costs in each of the cases in the lower Court be subject to the order and direction of the said Court upon the final disposition of the case.

*Decrees and cost disposed of as indicated above.*