BALTIMORE AMERICAN INSURANCE COMPANY
*v.* ERWIN IRA ULMAN ET AL., RECEIVERS.
[No. 69, October Term, 1933.]

*Decided January 12th, 1934.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Digges, Parke, and Sloan, JJ.

*J. Calvin Carney* and *Benjamin H. McKindless,* for the appellant.

*Louis J. Jira,* with whom was *Elbridge B. Donaldson* on the brief, for the appellees.

Parke, J., delivered the opinion of the Court.

The Leader Building and Loan Association of Baltimore City, Incorporated, hereafter to be called the association, was a building and homestead association incorporated under the laws of Maryland and engaged in business in Baltimore City, and was on November 17th, 1931, adjudged a bankrupt, and its affairs are in course of administration in bankruptcy by its receivers. The pending appeal grew out of a loan of $5,000 obtained by the association on October 21st, 1926, from the Baltimore American Insurance Company of New York, a body corporate, hereafter to be called the insurance company. For this loan the association gave its note, payable four months after date; and, by a short assignment written on the mortgage, it transferred to the insurance company, as collateral security for the payment of the note, the mortgage deed from Victor Conroy and Marie Conroy, his wife, to the association, conveying a certain tract of land in Baltimore City to secure the payment to the association of a loan of $6,900. The deed was in the form of a building association mortgage, without a note given to evidence the debt, and was executed on April 12th, 1926, and created a first lien

on the fee simple land conveyed. The mortgage deed had been duly recorded, but the assignment to the insurance company is not recorded, although it had been delivered, at the time of its making, to the insurance company. The association paid $2,500 on the principal of its loan from the insurance company, and the amount now due is $2,500, with interest from October 21st, 1930. On account of the bankruptcy of the building association, the insurance company must depend upon the collateral for the payment of the indebtedness.

The mortgagors sustained financial losses and could not meet the weekly payments on account of the principal, interest, and dues of the building association. So, in the spring of 1930, John W. Lohmuller, an attorney at law, counsel for the association, and one of its original directors, went to see the mortgagors and suggested that the association's mortgage be reduced, in order that the sum payable weekly to the association be lessened. As a result of this conference, it was agreed that Lohmuller should procure for the mortgagors as large a loan as possible, to be secured by a first mortgage of the common form used by an ordinary borrower and lender, and that the amount so obtained should be applied in reduction of the indebtedness to the association, whose mortgage lien for the residue of its claim should be subordinated to the mortgage lien of the new lender and mortgagee. In fulfillment of this understanding, Lohmuller obtained a promise from the Baltimore Trust Company that it would lend the association's mortgagors the sum of $3,000, which should be secured by a first mortgage lien on the same property of the mortgagors. As was its practice, the trust company looked to the borrower to secure an abstract of title, and left to Lohmuller the notification of the Maryland Title Company to furnish the abstract of title. The trust company, however, knew of the existence of the mortgage of the association on the property from the beginning of the negotiations for the loan, and also the financial circumstances and motives of the mortgagors, which caused the application to the trust company.

At this stage of the transaction, which was before the abstract of the title had been furnished, Lohmuller drew the mortgage from Conroy and his wife to the trust company to secure the loan of $3,000, but made no reference in the instrument to the subsisting prior mortgage to the association. The new mortgage to the trust company was dated and executed on May 31st, 1930, and given by the mortgagors to Lohmuller for delivery. The mortgagors both signed an order addressed to the trust company that authorized it to issue a check for the mortgage loan of $3,000 to John W. Lohmuller, attorney. Lohmuller testified that he left the signed and acknowledged mortgage with the title company, but this is denied by the representative of the title company, and the facts support the conclusion that the document was delivered to the trust company on the day of its signing, as the affidavit by the trust company's vice-president to the consideration was made on the same day, and on that day the trust company paid out $1,500 of the loan under circumstances now to be stated. There is no denial, however, that Lohmuller presented to the trust company the order of the mortgagors, and that on May 31st, at Lohmuller's request, the trust company issued a check on account for $1,500 to the Lohmuller Building Company, and delivered it to Lohmuller, and that on June 4th the trust company made the final payment by the delivery to Lohmuller of a check for $1,500 payable to his order as attorney.

The Lohmuller Building Company indorsed the first check to Lohmuller, who cashed this check on June 2nd, and the second check on June 5th. Neither of these amounts was paid to the association, and Lohmuller ultimately appropriated them to his own use. Meanwhile the abstract had been completed by the title company on June 2nd, and it was presented to Lohmuller. The abstract confirmed the information which the trust company had before either of the checks was given to Lohmuller, and reported the lien of the mortgage given to the association; and Lohmuller stated to the title company that he would obtain a waiver of this

existing mortgage lien, as the title company had refused to issue its policy assuring the title until this lien was removed.

The building association executed on June 10th, 1930, a waiver of its prior mortgage lien in favor of the Baltimore Trust Company mortgage. The waiver was effective in form, and the association's corporate name was subscribed by its president, its corporate seal affixed, and the acknowledgment was made by its president in his representative capacity, and the instrument was duly recorded on June 12th, 1930. By the recitals of the waiver, the trust company is represented as having made the loan to the mortgagors on June 10th, and the mortgage to the trust company as having been recorded on that day. The statement of the time of recording is correct, but the recital of the mortgage deed is that the loan was made on May 31st, and it was with reference to this loan of that date that the oath to the consideration was taken.

The testimony is that transactions which involve the examination, transmission, and guaranty of title are, as a general rule, concluded by a settlement in the office of the title company, but, in this instance, there was no participation by the title company in the details of the settlement, beyond furnishing an abstract of title, receiving the waiver for record, making the final examination to see if the record were clear, and then, on June 20th, delivering the policy guaranteeing the title.

The insurance company had received the collateral mortgage on October 21st, 1926, and had kept it continuously in its possession until June 23rd, 1931, when Lohmuller called at its office in Baltimore and stated that the mortgagors were in default and that he wanted to foreclose the mortgage. Lohmuller was the attorney named in the mortgage for the purpose of foreclosure, and the mortgage, with the unrecorded assignment indorsed upon the instrument, was delivered to him to foreclose for the account of the insurance company. Lohmuller gave a receipt for the mortgage, and left with it in his possession. Without the knowledge or consent of the assignee, Lohmuller struck out the assignment,

and instituted foreclosure proceedings in the name of the association on July 3rd, 1931.

The insurance company was without any actual information or knowledge with respect to the second mortgage or the waiver, or any of the circumstances in relation to either of these documents, until about a month later, when Lohmuller's conduct in financial matters became notorious, and the insurance company, by reason of these reports, directed its attorney to make an investigation, and his actions in connection with the foreclosure and the associated matters became known to the insurance company, which began a proceeding to set aside the foreclsoure suit, and shortly afterwards instituted the cause now before the court.

John W. Lohmuller was one of the incorporators and first directors of the association in 1911, and was, at the time of all the transactions mentioned, its regular attorney, who was an officer provided for by the constitution and by-laws of the association and expressly given "general charge of the legal business of the Association." Whether he continued as a director does not appear on the record, but he customarily acted for the association not only in his professional capacity, but in the carrying on of its business affairs, whatever may have been his other official connection. There is no contradiction to his testimony that he had most of the "free share" money of the association, and that almost all of the money, in the numerous transactions of the association, was paid to him and deposited by him in his personal account, and that periodically he would account to the association for these funds. No change in these methods occurred until the mid-year of 1931, when the crisis came in Lohmuller's affairs and put an end to his career.

The court has not undertaken an analysis of the testimony in order to disclose the process by which a fact is determined, but has set forth the facts according to the uncontroverted testimony, and its conclusion, according to the weight of the evidence, on those few conflicts in the testimony offered. On the facts here presented, Lohmuller had, during a long course of management of the affairs of the corporation and of the

638

exercise of its corporate powers, been presented to the public as its authorized possessor of extensive powers and functions. His frequent and continuous employment in similar acts or transactions as those here described, and his customary receipt of the money of the association, and thereafter depositing it to his own account, where it remained until a periodic settlement with the association was made, show a course of dealing of which the various acts done in the particular instance would be a consistent part, and in which the principal corporation had so long acquiesced, participated, and benefited, as reasonably to lead to no other conclusion than that of a general and continuous agency for the doing of the acts of a similar nature. 1 *Mechem on Agency* (2nd Ed.), sec. 244; *Martin v. Webb,* 110 U. S. 7, 3 S. Ct. 428, 28 L. Ed. 49.

In all the matters, therefore, that developed throughout the entire transaction, and that were done for the benefit of the association, in which Lohmuller participated, his acts were for the association, his principal, as its general agent. The knowledge of the agent acquired in the course of his agency is, consequently, imputed to the association as his principal. In addition, Lohmuller was the special agent of the mortgagors to procure the new mortgage loan and to receive the payment of the loan and to see that it was applied in partial discharge of the original mortgage indebtedness to the association. The mortgagors knew of his general agency for the association, and there was no inherent nor actual conflict in Lohmuller so representing the association and the mortgagors, since they had a common purpose and interest in the successful issue of the undertaking. All that the agent of the two principals did in pursuance of his general and special agency would bind the principals according to their several principalships. Every act of the double agency was done while the agent was engaged in the business either of one or the other of the principals, with the single exception of his request that $1,500 of the new mortgage loan would be paid to the Lohmuller Building Company and his taking of the check so drawn by the new mortgagees. In this excep-

tional instance, the agent, in order to subserve his own interests, violated his duty to both principals in this conversion of funds to his own use, since the mortgagors had expressly limited in writing his agency in this payment to the acceptance of a check from the new mortgagee for the full sum of the loan of $3,000 and made payable to the order of the agent as attorney, so that it might be applied by the agent in partial liquidation of the first mortgage debt; and, similarly, the association was to receive the full amount of the new mortgage debt as a credit upon the former mortgage to the association.

The trust company had in hand the explicit written limitation of the mortgagors on their agent's power to receive the sum loaned, and it was solely because of the trust company's deliberate violation of its only authority to pay out the loan that the fraudulent conversion of one-half of the sum loaned was effected. The payment thus made in disregard of the mortgagors' plain order to a third person, at the instance and request of Lohmuller, is not a payment to the mortgagors on account of the new mortgage loan. Since this sum of $1,500 was never received by the mortgagors nor applied to their use or benefit, and there is no evidence on the record that they ever adopted or ratified this wrongful payment, the mortgage to the trust company fails of consideration to the extent of $1,500 as of the date of the mortgage, and the trust company mortgage debt can only stand and be made effective in the sum of $1,500, with interest from the date of the mortgage. *Hunter v. Chase,* 144 Md. 13, 123 A. 393; *Riley v. Woodall,* 145 Md. 125, 125 A. 503; *Whistler v. Hanna,* 152 Md. 597, 137 A. 276. It follows from this conclusion that, as against the association, the mortgagors would be entitled to a credit in the amount of $1,500 on the association's first mortgage, since this sum was paid to the general agent of the association for its benefit in the due course of his employment and in behalf of his principal.

This credit would also have prevailed against the assignee of the association, so far as the mortgagors are concerned, because of the statutory effect given to the assignee's failure

to record its assignment prior to the execution of the second mortgage (Code, art. 66, sec. 25), but for the fact. that, at the time that the sum of $1,500 was paid to Lohmuller, he was the special agent of the mortgagors to take and pay this fund to the association as a credit on the mortgagors' mortgage to the association, and then, the circumstances show, had present in his mind the knowledge that the association had pledged the mortgage as collateral. *Mechem on Agency* (2d Ed.), secs. 1808-1813; *Restatement A. L. I. Agency*, sec. 276; *Schwind v. Boyce*, 94 Md. 510, 517-519, 51 A. 45; *Md. Trust Co. v. Mechanics' Bank*, 102 Md. 608, 630, 63 A. 70; *Peninsula Trust Co. v. Johnson*, 128 Md. 535, 540, 97 A. 925; *Baltimore v. Whittington*, 78 Md. 231, 237, 27 A. 984; *Miller v. Mitnick*, 163 Md. 113, 118, 161 A. 157; compare *Lohmuller Bldg. Co. v. Gamble*, 160 Md. 535, 538-541, 154 A. 41. Since, with respect to this payment of $1,500 to Lohmuller as attorney, he was an agent acting for the benefit of the mortgagors within the scope of his employment, and his deposit of the amount of the check to his personal account was in the course of his agency for the association, and his later wrongful conversion of the sum was a subsequently conceived act, his prior receipt of the sum of $1,500 as attorney was not adverse either to the mortgagors or to the association. The knowledge of the agent that the association had assigned the mortgage to the insurance company was therefore notice to his principals, the mortgagors, of the assignment of the first mortgage to the insurance company, and the mortgagors would be charged with the knowledge of the assignment, and this knowledge would prevent, in equity, the provisions of section 25 of article 66 of the Code from applying in favor of the mortgagors, so as to entitle them to a credit of $1,500 as against the claim of the pledgee. *Morrow v. Stanley*, 119 Md. 590, 596-601, 87 A. 484. The conclusion reached assures to the insurance company a first mortgage lien on the land as collateral security under the assignment, which it has a right to record.

2. The fraudulent conduct of the agent in having the first check of the trust company for $1,500 made payable to the

Lohmuller Building Company for his own personal benefit made neither the mortgagors nor the association responsible for the fraud or affected by it, because, when the fraud was committed, the agent was not acting, nor professing to act, within the scope of his authority, but the fraud was an incident to an act done by the agent in furtherance of his own purpose. Lohmuller, in the transaction which constituted the wrongful act, neither acted nor seemed to be acting for either of his two principals, since the mortgagors had specifically limited his authority to the receiving a check for the total sum loaned payable to him as attorney, and he had been employed by the association to collect the money for its benefit. The trust company could not have believed that the act in question was within the scope of his authority, because it had previously been apprised of these bounds to the representative capacity of Lohmuller. The agent had no authority to commit a fraudulent act.

On the other hand, the receipt of the check to Lohmuller, as attorney, for the $1,500 was one of the objects of the agency, and so within the scope of his authority as the general agent of the association, since it was in the course of the agency and by virtue of the authority as agent. The collection by the agent of the sum of $1,500 was connected with the business of the agency, and payment, therefore, to the agent was payment to the association; and consequently the subsequent appropriation of the money received by the agent was the loss of the association, because, although fraudulent, the wrongful act was committed in the course of the business which the agent had the authority to transact. Every principal assumes the risk of the agent's fraud in the discharge of his duties in a representative capacity. The power given to act, although honest and faithful ones only are contemplated or directed, involves the possibility of fraudulent or faithless acts done. *Andrews v. Clark,* 72 Md. 396, 20 A. 429; *Metropolitan Club v. Hopper, McGaw & Co.,* 153 Md. 666, 672, 673, 139 A. 554; *Mechem on Agency* (2nd Ed.), sec. 1984.

The insurance company was under no compulsion to record the assignment to it of the first mortgage as collateral security (*Getz v. Johnston,* 143 Md. 548, 123 A. 74; *Dickey v. Pocomoke City Bank,* 89 Md. 280, 43 A. 33), but, until recorded, the assignee assumed, by reason of the provisions of section 25 of article 66 of the Code, the risk of the mortgage debt being conclusively presumed to be in the person or corporation holding the title of record to such mortgage deed (*Frederick County National Bank v. Schlosser,* 152 Md. 609, 615, 137 A. 351; *Bower v. Kelbaugh,* 147 Md. 364, 367, 128 A. 37; *Churchville Circuit of M. E. Church v. MacNabb,* 145 Md. 105, 125 A. 526). An unrecorded assignment, however, is operative as an equitable assignment against those who had either knowledge or notice of the existence of the assignment when their titles or rights were obtained. *Morrow v. Stanley,* 119 Md. 590, 596-601, 87 A. 484.

In the instant case the evidence does not show that the trust company had knowledge or notice of the assignment of the first mortgage deed to the insurance company, and therefore the trust company must be held entitled to rely upon the title of the proposed mortgagors as it appeared on the record. The first mortgage deed was, however, on record, and the trust company therefore had notice that its proposed mortgage would be postponed in priority to the existing mortgage, unless the holder of that mortgage would release its lien. The trust company also had the knowledge that the mortgagors had sought, and the trust company had granted, the loan of $3,000, to be applied as a credit on the first mortgage debt of $6,900, in order that this loan could be reduced in this manned to $3,900, and the first mortgage lien be then subordinated in priority of lien to the new mortgage to be given the trust company. The nature of this financial operation involved a delivery of the several instruments to consummate the transaction and to secure to the mortgagors a proper application of the loan to the first mortgage debt, and the waiver or release of the priority of the first mortgage with respect to the lien of the second. Without the presence of the mortgagors or of any other representative of the association,

and with actual knowledge of the existence of the first mortgage, and without the waiver or release of its lien, the trust company paid the money agreed to be loaned. 2 *Sugden on Vendors* (14th Ed.), (668) top pp. 370-372. Notwithstanding its knowledge that it was the common understanding that the proceeds of the loan were to be applied in part liquidation of the debt secured by the first mortgage deed, and in violation of the plain written order of the mortgagors that the entire loan should be paid by a check to Lohmuller, the trust company, in compliance with the sole request of Lohmuller, which he had made in violation of his agency, drew on May 31st a check for $1,500 to the Lohmuller Building Company, which had no right to it, and delivered it to Lohmuller; and on June 4th wrote a check to John W. Lohmuller, attorney, for $1,500, and delivered it to him. When these checks were issued and paid, the title company had not submitted the abstract of title, and the second mortgage deed was not recorded, nor was the waiver of the association even prepared. By these acts the trust company became a participant in the fraudulent acts of Lohmuller in converting to his own use or purposes one-half of the principal of the loan. Furthermore, with complete information of the existence of the first mortgage lien of the association, and that the proceeds of the loan were to be applied in its part liquidation, it neither required the contemporaneous release or waiver of the lien of the first mortgage, nor saw to the application of the credit, but delivered the checks to an agent, who, in that very transaction, had not only shown himself faithless to his principals, but had also induced the trust company to become an accomplice in his wrongdoing. Under such circumstances of wrongful conduct and unreasonable assumption of risk in the premature payment of the amount of the loan, the trust company incurred all the chance of Lohmuller's performance within the scope of his undertaking when it relied upon him to establish its second mortgage deed as a preference to the first mortgage lien of the association. *Md. Trust Company v. Mechanics' Bank,* 102 Md. 608, 630, 63 A. 70; *Carrington v. Basshor Co.,* 118 Md. 419, 429, 84 A. 746; *Safe Deposit & Trust*

*Co. v. Cahn,* 102 Md. 535, 62 A. 819; *Duckett v. Mechanics' Bank,* 86 Md. 400, 403-406, 38 A. 983; *Duckett v. Bank of Baltimore,* 88 Md. 8, 21, 41 A. 161, 1062; *Basshor Co. v. Carrington,* 101 Md. 606, 630, 65 A. 360.

In enabling Lohmuller to divert $1,500 of the loan to the Lohmuller Building Company, the trust company furnished Lohmuller with a powerful incentive for his subsequent fraudulent conduct.

On June 10th Lohmuller procured from the association an instrument executed by the association, whereby it waived priority under its first mortgage lien in favor of the trust company's mortgage for $3,000, which had been recorded on that day. This waiver was recorded on June 12th. There was no release in this document of the first mortgage lien to the extent of $3,000, and no acknowledgment of a credit to be made in the amount of the proceeds of the loan, and no part of the loan was ever paid to the association. The mortgage deed whose lien the instrument purported to waive was not in the possession of the association, but was, as the association and Lohmuller both knew, in the possession of the insurance company under a valid but unrecorded assignment as collateral for an overdue loan of $2,500, with interest from October 21st, 1930. In short, the association, at the instance of Lohmuller and with his wrongful concurrence, undertook to waive priority of a mortgage which it had formally assigned by a valid transfer in writing to the insurance company. Not only did the association attempt to waive, without the knowledge or authority of the pledgee, the priority of a mortgage deed which it had pledged, but it did so without making any reduction of the obligation to the association of the mortgagors. The fraud thus perpetrated was, under the circumstances, within the scope of Lohmuller's undertaking, and so is void as against the insurance company, the innocent pledgee. The position of the pledgee, by virtue of its failure to record the assignment, is so different in nature with that of the trust company that there is no parity in their respective situations with respect to the wrongful acts of Lohmuller and the association, so as to create the necessity

of choosing between two innocent persons. The failure of the assignee to record its assignment was not culpable, since it rested upon the reasonable assumption that the association would act honestly. As a result of its failure to have the assignment recorded, the statute created a status with respect to the holder of the unrecorded assignment and those who acted in good faith upon the apparent record title, but that status cannot be used in equity to aid a party whose record position does not rest upon a valid document of title, but upon one fraudulently procured and executed.

The assignee and the second mortgagee or trust company are not equally innocent, and the loss must fall upon the trust company, because it cannot avail itself of documents of title which were procured by the combination of its own wrongful acts and those of one acting in its behalf, and in the course of an employment in which the trust company had put itself entirely in the hands of Lohmuller. The trust company is not in a position to repudiate the agency while attempting with knowledge to obtain and retain benefits resulting from the wrongful act. *Mechem on Agency* (2nd Ed.), sec. 1818; *Kerr on Fraud and Mistake* (6th Ed.), 374-378; *Harrison v. Harrison,* 160 Md. 378, 384, 153 A. 58; *Cushwa v. Cushwa's Lessee,* 5 Md. 44, 50-54; *Md. Trust Co. v. Mechanics' Bank,* 102 Md. 608, 631, 63 A. 70; *Baxter v. Deneen,* 98 Md. 181, 203, 57 A. 601; *Brown v. Reilly,* 72 Md. 489, 492, 20 A. 239; *Snyder v. Snyder,* 51 Md. 77, 80; *Roman v. Mali,* 42 Md. 513, 531, 532.

Equity will declare and enforce the rights of those entitled to recognition within its principles, but, where parties are found to have participated in fraudulent acts, chancery will not, as a rule, intervene as between the wrongdoers, but will let them stay in the situation where they have fallen. *Supra.* It follows that the waiver executed by the association will be suffered to be effective as against the association for the benefit of the trust company, after the rights of the insurance company and the mortgagors are enforced as indicated by this opinion.

The application of these conclusions will require or deter-

mine (1) that leave should be granted the insurance company to record the short assignment to it of the first mort-. gage deed by the association; (2) that the insurance company by its unrecorded assignment holds as against the trust company and the association the first mortgage lien on the property known as 2702 Louise Avenue, Baltimore, in its principal amount and interest, as collateral security for the principal and interest remaining due of the overdue note of the association to the insurance company; (3) that, subject to and after the discharge in full of the indebtedness of the association to the insurance company on the note of the association to the insurance company, for whose payment to this extent the mortgage of the association is pledged and is operative, the trust company holds as against the association a mortgage lien on said property to secure the sum of $1,500, instead of $3,000, as declared in the mortgage deed, with interest on said $1,500 from May 31st, 1930; (4) that, after the satisfaction of the indebtedness on said note of the said insurance company for which said first mortgage deed was pledged as collateral to the insurance company, and then subject to the priority of the trust company's second mortgage lien to the extent of $1,500, with interest from May 31st, 1930, the association is entitled to the security of the first mortgage lien of the mortgagors to the extent of the mortgage indebtedness to said association remaining due after the entry of a credit to the mortgagors of the sum of $1,500 as of the 31st of May, 1930.

As these conclusions are only partly in accord with the decree passed by the chancellor, the decree must be reversed.

> *Decree reversed, and cause remanded for the passage of a decree in conformity with this opinion; and the costs, here and in chancery, to be paid one-third by the Baltimore Trust Company and two-thirds by the receivers of the Leader Building and Loan Association.*